IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**STEVEN BERNDT et al.,**
individually and on behalf
of all others similarly situated,

Case No. 11-cv-791

Plaintiffs,

vs.

**CLEARY BUILDING CORP.**

Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION AND JUDICIAL NOTICE**

## TABLE OF CONTENTS

INTRODUCTION .............................................................. 5

FACTUAL BACKGROUND .................................................. 6

    I. CLEARY EXECUTIVES IMPLEMENTED THE ILLEGAL POLICY AT ISSUE AND ENFORCED THE POLICY THROUGH REGIONAL AND BRANCH MANAGERS COMPANY WIDE .................................... 6

        A. Cleary Executives Mandated that Cleary Field Crew Employees Report to the Branch Office Each Morning and Attend Daily Production Meetings ................................. 8

        B. Cleary Regional Managers Implemented and Enforced Cleary's Corporate Policy of Not Compensating Field Crew Member Work Through Communication With Branch Managers .................... 15

        C. Field Crew Employees Followed the Instructions of Their Supervisors and Reported to the Branch Office To Perform Work ....................................................................... 20

            1. Cleary field crew were required to perform work at branch offices each morning. ....................................................... 25

            2. Cleary field crew were required to perform work at the branch office after returning from the jobsite at the end of the day ............................................................................ 29

    II. CLEARY CORPORATE DOCUMENTS REINFORCE AND REAFFIRM THE PRACTICES DICTATED BY TODD MONTGOMERY REQUIRING FIELD CREW EMPLOYEES TO REPORT TO THE BRANCH OFFICE EACH MORNING AND ATTEND DAILY PRODUCTION MEETINGS. 32

    III. CLEARY FIELD CREW MEMBERS WERE NOT PAID THEIR REGULAR OR OVERTIME WAGES FOR ALL HOURS SPENT PERFORMING MANDATORY DAILY WORK AT THE BRANCH OFFICE. ................................................................... 33

    IV. CLEARY NON-DRIVER FIELD CREW MEMBERS WERE NOT COMPENSATED FOR TRAVEL TIME  TO THE JOBSITE AFTER PERFORMING WORK AT THE BRANCH OFFICE EACH MORNING. 38

**ARGUMENT** ................................................................. 40

I. CLEARY MAINTAINED A UNIFORM ILLEGAL PAY POLICY WHICH VIOLATES WISCONSIN, MINNESOTA, IOWA, AND ILLINOIS LAW 40

II. CLEARY'S PAY POLICIES VIOLATED WISCONSIN, ILLINOIS, IOWA , AND MINNESOTA LAW ........................................................ 41

III. PLAINTIFFS HAVE MET THE FED. R. CIV. P. 23 STANDARDS FOR CLASS CERTIFICATION ........................................................ 43

    A. The Implicit Requirements of Fed. R. Civ. P. 23 are Met Because the ........ Class Representatives Have Standing and are Members of the Precise, Objective, and Ascertainable Classes 43

    B. Plaintiffs Have Satisfied the Fed. R. Civ. P. 23(a) Requirements ............................................................................ 48

        1. The Class Members Are So Numerous That Joinder Is Impossible .......................................................................... 48

        2. Questions of Law and Fact Are Common to the Class .. 49

            a. Commonality Exists Because the Plaintiffs Have Demonstrated That  Cleary Maintained an Illegal Pay Policy Which Was Uniformly Followed At Branches In Wisconsin, Iowa, Illinois, and Minnesota ............................................................. 51

            b. Variations in plaintiff damages do not defeat commonality. ......................................................... 56

        3. The Claims of the Representative Parties Are Typical of the Claims of the Class ...................................................... 58

        4. The Class Representatives Will Fairly and Adequately Protect the Interests of the Class ...................................... 61

IV. THE PLAINTIFFS HAVE SATISFIED THE FED. R. CIV. P. 23(b)(3) REQUIREMENTS .................................................................. 62

    A. Questions of Law or Fact Common to the Entire Class Predominate Over Individual Issues .......................................... 63

1. The Question of Whether Cleary Maintained a Uniform Illegal Pay Practice Predominate Over Individual Issues 64

2. Comcast Corp. v. Behrend and Its Progeny Do Not Foreclose Class Certification in This Case ...................... 71

3. Plaintiffs Can Demonstrate Damages For Class Using A Common Methodology ....................................... 76

B. A Class Action Is Superior to Other Methods Available for Fair and Efficient Adjudication ................................. 79

V. THE PLAINTIFFS' PROPOSED FORM AND MANNER OF SERVICE OF NOTICE ARE APPROPRIATE .......................... 84

CONCLUSION .............................................. 85

## INTRODUCTION

Cleary Building Corp. ("Cleary") maintained a company-wide policy which deprived field crew employees compensation for time worked; it required them to arrive at the branch office each day, attend meetings, and load vehicles prior to traveling to the job site and after returning from the job site. This policy was implemented from the top and enforced at every level at Cleary. With this Motion, the Plaintiffs present evidence that Todd Montgomery, Senior Vice President of Sales and Operations for Cleary, ordered Cleary's general operations managers, regional managers, and branch managers to require field crew employees to report to the branch office each morning and to attend mandatory meetings, without pay. To be clear, no Cleary field crew employee has been paid for this time and more than 100 employees working at 57 Cleary branches have offered testimony that they were required to perform this uncompensated work.

Fed. R. Civ. P. 23 certification of the Plaintiffs' state law classes for field crew employees in Wisconsin, Minnesota, Iowa, and Illinois is appropriate in this case. A common question is dispositive of the case and can be answered by the trier of fact: did Cleary maintain an illegal pay policy which suffered and permitted its field crew employees to perform work at the branch office and travel to and from the branch office without compensation?

Although the Plaintiffs are not required to prove liability at this stage, and many courts do not consider questions of liability at class certification, the Plaintiffs present the Court with substantial evidence that such a policy did exist at Cleary.

Each of the putative class members suffered the same injury under Cleary's illegal

pay policy and the Plaintiffs will be able to establish damages through

representative testimony.

Because the putative classes meet all other requirements of Fed. R. Civ. P.

23(a) and (b), the Named Plaintiffs request that the Rule 23 classes of Cleary

employees be certified and that Notice be provided to the putative class members.

## FACTUAL BACKGROUND

### I.    CLEARY EXECUTIVES IMPLEMENTED THE ILLEGAL POLICY AT ISSUE AND ENFORCED THE POLICY THROUGH REGIONAL AND BRANCH MANAGERS COMPANY WIDE

Cleary is comprised of 79 branch offices throughout the United States.

(Deposition Transcript of Fed. R. Civ. P. 30(b)(6) Designee Daniel J. Bullock, Cleary

Chief Financial Officer ("Bullock Depo."), dkt. # 32, at 65:9-13,). Each branch office

is staffed with field crew employees who perform construction work for Cleary. (Id.

at 69:15-25). For purposes of this brief, the term "field crew" encompasses only non-

foreman employees.[1] Each branch office is managed by a branch manager. (Id. at

68:1-25). Branch offices are organized into regions and each region has a designated

regional manager who oversees the branch offices assigned to the region.

(Declaration of David Steele, Former Cleary Regional Manager, Region 8, dkt. #42,

at ¶4 ("Steele Dec."); Declaration of Greg Hodges, Former Cleary Regional Manager,

Region 12-13, dkt. #90, at ¶6 ("Hodges Dec."); Deposition Transcript of Greg Hodges

---

[1] Plaintiffs' Third Amended Complaint includes a Wisconsin foreman class, the claims of which Plaintiffs are no longer advancing in this motion. While the Plaintiffs do not seek to certify their Wisconsin Rule 23 Class on behalf of foremen, the Plaintiffs do continue to assert an FLSA collective foreman class of employees nationwide.

("Hodges Depo."), dkt. #176, at 25:17-20; Declaration of Justin Thompson, Former Cleary Regional Manager, Region 6, dkt #196, at ¶ 5 ("Thompson Dec.")). Above regional managers, Cleary employs General Managers of Operations (GMO).[2] (Bullock Depo. at 70:19-22; 70:25-21:1-2, dkt #32). The GMO is a corporate level position within Cleary and employees hired into this position work out of Cleary's Verona, Wisconsin headquarters and report directly to Todd Montgomery, Cleary's Senior Vice President of Sales and Operations. (Id. at 71:3-5; Declaration of George Sapon ("Sapon Dec."), dkt. #192, at ¶9; Declaration of Aaron Stinksi ("Stinski Dec."), dkt. #193, at ¶5). Also located at the Verona Corporate office are Cleary officers and directors, such as President Sean Cleary, Chief Financial Officer Dan Bullock, as well as Former Assistant General Managers of Operations. (Declaration of Wendy Akers ("Akers Dec."), dkt. # 194, at ¶5).

Cleary policy and practice is dictated and disseminated from the corporate office. Cleary has a lengthy field crew employee handbook and an even lengthier branch operations manual which establish certain policies and procedures for Cleary employees. (Declaration of William Parsons in Support of Motion for Class Certification and Judicial Notice ("Parsons Dec."), dkt. # 315, Ex. 1, Branch Operations Manual; Parsons Dec., Ex. 2, Field Crew Employee Handbook). However, the handbook explicitly states that Cleary "reserves the right to modify, revoke, suspend, terminate or change any or all such plans, policies, or procedures,

---

[2] At one point during the relevant statutory period, Cleary employed two GMOs, each of whom were responsible for half of the regions in the country – Eastern and Western Divisions (Akers Dec. ¶3).

in whole or in part, at any time, with or without notice." (Parsons Dec., Ex. 3, Bates 032151 from Field Employee Handbook).

When modifying or altering the policies contained in the handbooks, Cleary corporate officers provide verbal and written communication regarding a wide variety of information covered in the handbook, including Cleary pay practices, to regional managers who then relay the information to branch managers. (Sapon Dec., dkt. # 192, at ¶9; Stinski Dec., dkt. #193, at ¶9; Akers Dec., dkt. #194, at ¶11; Hodges Dec., dkt. #90, at ¶7; Steele Dec., dkt. #42, at ¶6; Thompson Dec., dkt. #196, at ¶6; Hodges Depo., dkt. #176, at 100:15-25; 101:1-23; 110:21-22; Deposition Transcript of Michael Brah ("Brah Depo."), dkt. #177, at 46:9-13; 56:19-20; 66:24-24 – 67:1-2; 71:10; 72:10-25, dkt #177; Deposition Transcript of Mike Irvin ("Irvin Depo."), dkt. #178, at 126:4-24; 135:7-9). Branch managers are then responsible for providing field crew employees with information about corporate-wide policies and practices as articulated by both the handbooks and the directives from corporate officers. (Declaration of Former Branch Manager Michael Brah ("Brah Dec."), dkt. #33, at ¶6; Declaration of Former Branch Manager Michael Irvin ("Irvin Dec."), dkt. #35, at ¶4; Declaration of Former Branch Manager Gregory Baumgardner ("Baumgardner Dec."), dkt. #197 at ¶¶ 4-5; Declaration of Sandwich, Illinois Branch Manager, William Cleveland ("W. Cleveland Dec."), dkt. #198 at ¶3).

## A. Cleary Executives Mandated that Cleary Field Crew Employees Report to the Branch Office Each Morning and Attend Daily Production Meetings

Field crew employees were required to report to Cleary branch offices each morning to attend a "crew" or "production" meeting. This practice was dictated by

8

Cleary's corporate office, through Todd Montgomery, to the GMOs, down to regional managers and branch managers with the expectation that it would be communicated to the field crew and enforced uniformly.

Cleary's former GMO, George Sapon, has offered a declaration in support of this Motion. (Sapon Dec., dkt. #192). Mr. Sapon reported directly to Cleary Vice President Todd Montgomery, who was responsible for crew operations throughout the country. (Id. at ¶9). Mr. Sapon himself oversaw the operation of more than 30 branch offices in Wisconsin, Illinois, Indiana, Ohio, Kentucky, Minnesota, Iowa, Missouri, and Pennsylvania. (Id. at ¶3). Sapon's testimony is that the directive for employees to report to the branch office and attend these uncompensated meetings came directly from Todd Montgomery:

> Throughout the course of my employment with Cleary, I discussed the pay policies and practices for field crew employees with Todd Montgomery. We had these discussions privately. During our private discussions, Todd Montgomery explicitly directed me to direct regional managers and branch managers not to pay field crew employees for mandatory work:
>
> a. Mandatory morning production meetings held at the branch offices;
> b. Work performed at the branch office after mandatory meetings but prior to leaving for the job site;
> c. Travel time between the branch office and the job site;
> d. Work performed at the branch office at the end of the day after returning to the job site.

(Sapon Dec., dkt. # 192, at ¶9).

Sapon is not the only GMO who has offered testimony that these directives came from Cleary corporate offices and from Todd Montgomery specifically. Aaron Stinski served as the interim GMO for the East Central Division between 2008 and 2009 and oversaw 14 branch offices in Minnesota, Iowa, Wisconsin, Illinois, and Missouri. (Stinski Dec., dkt. # 193, at ¶3). He testifies that:

> As [General Manager of Operations], I had multiple conversations with Todd Montgomery wherein we discussed the mandatory nature of the morning production meetings and he stated to me that both foremen and field crew employees were required to attend all meetings at branch offices, including morning production meetings.

(Id. at ¶9). Stinski goes on to testify that:

> … These conversations with Todd Montgomery typically occurred prior to leaving for a trip to visit branch offices. Todd Montgomery was explicit in his expectation that both foremen and crew members were to be present at the morning meetings, at the branch office, for the branches I visited and specifically for those branches that were not performing up to Cleary's target budget goals.

Beyond this, Wendy Akers, former Assistant General Manager of Operations for the Eastern Division, Regions 8-13 (which included branches in Iowa, Minnesota, Wisconsin, Michigan, Missouri, Kentucky, Indiana, Ohio, and Pennsylvania), reports similar instructions from Todd Montgomery. Specifically that:

> As the Assistant General Manager of Operations, on multiple occasions, I communicated to regional and branch managers that foremen and crew members must report to the field office each morning. I did so at the instruction of Todd Montgomery.

(Akers Dec. dkt. # 194, at ¶8). Akers further testifies that:

> …I instructed regional managers in regions 8-13 that all field personnel were required to report at the branch office to make sure that Cleary vehicles were ready for the workday. I did so at the direction of Todd Montgomery. I discussed the issue with Todd Montgomery who informed me that this work was to be performed by the field crew employees each morning.
>
> […]
>
> …I instructed regional and branch managers in regions 8-13 that field crew employees were required to perform work each morning prior to traveling to the job site […]. I instructed regional and branch managers in this manner based on conversations I had with Todd Montgomery wherein he advised that this morning work was mandatory and had to be completed on a daily basis.

(Id. at ¶9-10).

Todd Montgomery also communicated these directives directly to regional and branch managers. For instance, Region 8 Manager, David Steele, testified during his deposition as follows:

> Q:   Why did you instruct the Region 8 branch managers in the manner referred to in paragraph six of Exhibit 8?
>
> A:   Why did I instruct the branch managers to hold daily, mandatory morning crew meetings wherein all of the branch field employees were required to attend?
>
> Q:   That is correct.
>
> A:   Tom Montgomery directed me to do this directly.
>
> Q:   And he told you to do that?

A:     Yes, he did.

(Deposition Transcript of David Steele, ("Steele Depo."), dkt. #86, at 64:22-25 – 65:1-8).

Region 12-13 Manager, Greg Hodges, testified to similar directives from Todd Montgomery:

> Q:     … Are you saying that Mr. Montgomery instructed you and
>
> other regional mangers that the daily production meetings, is
>
> that what it's called with the branch and the foreman, that non-
>
> foreman field employees must attend those meetings as well, is
>
> that what you're saying?
>
> A:     Yes.

(Hodges Depo., dkt. #176, at 101:16-23,).

Region 6 Branch Manager Justin Thompson provided a declaration in support of this Motion regarding similar instructions from Todd Montgomery:

> Prior to November or December 2011[3], I instructed
> Region 6 branch managers to hold daily, mandatory
> morning crew meetings wherein all of the branch field
> employees were required to attend. Attendance was
> mandatory for all branch field employee crew. I
> instructed branch managers in this manner pursuant to
> Cleary policy and based on conversations I had with
> Cleary Vice President, Todd Montgomery.
>
> […]
>
> Throughout my tenure as Regional manager of Region 6,
> Todd Montgomery instructed me to perform "spot
> checks" on my region's branch offices to ensure that

---

[3] Thompson testifies that Cleary changed its policies after the filing of this lawsuit on or around November or December 2011. (Thompson Dec. at ¶7).

> these morning meetings were being held. "Spot checks"
> consisted of me and sometimes Todd Montgomery
> calling the branch in the morning to speak during the
> meeting and to ensure the meeting was being held.

(Thompson Dec., dkt. #196, at ¶¶ 6-7).

Todd Montgomery also communicated directly with branch managers on certain occasions regarding these practices. For instance, Branch Manager of the Cokato, Minnesota branch, Mike Irvin testified:

> Q:    Okay. And who would have told you to be there if it wasn't
>
>       policy?
>
> A:    Todd Montgomery would defer it down to Dave Steele, which
>
>       deferred down to us.
>
> Q:    From your perspective, if there was a meeting time established
>
>       by someone, would that normally have been from the regional
>
>       manager rather than Mr. Montgomery directly?
>
> A:    No.
>
> Q:    Okay. How would it come from Mr. Montgomery, in a written
>
>       format?
>
> A:    Either written or telephone.

(Irvin Depo., dkt. # 178, at 126:8-19).

Sandwich, Illinois Branch Manager, William Cleveland, testified that he was

> [e]xplicitly advised by the Cleary Vice President, Todd
> Montgomery, that these meetings were mandatory for
> all field employees and that Cleary policy required to
> have these meetings with the entire crew at least three
> times per week.

[…]

> On the other two days of the week […he] still required
> [his] entire crew to report to the branch office each
> morning to load the crew trucks and so the crew could
> travel to the jobsite together.

(W. Cleveland Dec., dkt. #198 at ¶¶5-6).

Similar directives were given to Slinger Branch Manager Mike Brah, who testified that Todd Montgomery's "mantra" was that branch managers needed to "meet with [their] guys every day." (Brah Depo., dkt. #177, at 66:24-25 – 67:1-2, 71:10, 75:11-16; 76:9-12).

As is clear from the testimony above, these directives were frequently communicated to GMOs as well as regional and branch managers by Todd Montgomery.   Internal email correspondence between Cleary employees also indicates that these policies were well known and disseminated corporate-wide by other Cleary executives as well.  For instance, Safety and Loss Control Manager, Jared Weber, emailed the following directive to branch managers:

> In your next daily Production meeting with your crews, I
> would like to ask the crew workers what their thoughts
> about the new fall equipment are.

(Parsons Dec.,  Ex. 4, Bates 19216,).

Similarly, Assistant GMO of the Eastern Division, Ron Reichert, emailed branch managers to:

> Address this issue with your foremen and crews – do so in
> your daily morning meetings.

(Parsons Dec., Ex. 5, Bates 27471-72).

14

**B.  Cleary Regional Managers Implemented and Enforced Cleary's Corporate Policy of Not Compensating Field Crew Member Work Through Communication With Branch Managers**

Testimony from individuals employed by Cleary as GMOs reveals that Cleary's practices were received from the corporate level, communicated to regional and branch managers, and enforced consistently at the branch level, including in branch offices throughout Minnesota, Wisconsin, Illinois, and Iowa. On this point, former GMO George Sapon, provided testimony indicating that, "as the GMO, [he] verbally instructed both Regional Managers and Branch Managers who reported to [him] that the meetings were mandatory and that they were to advise their field crew accordingly." (Sapon Dec., dkt. # 192, at ¶7). Based on this testimony alone, at least 30 branch offices in a minimum of 9 states were under orders from Todd Montgomery through George Sapon to hold daily mandatory meetings. Similarly, former GMO Aaron Stinski communicated the same instructions to regional managers in Minnesota, Wisconsin, Illinois, and Iowa during his tenure as GMO:

> As the GMO, on multiple occasions, I communicated to Regional Managers that crew members must report to the field office each morning. I did so at the instruction of Todd Montgomery. […] Todd Montgomery was explicit in his expectation that both foremen and crew members be present at the morning meetings, at the branch office, for the branches I visited and specifically for those branches that were not performing up to Cleary's target budget goals.

(Stinski Dec., dkt. #193, at ¶9).

Akers also communicated such instructions to regional and branch managers in Regions 8-13:

15

> Todd Montgomery informed me of any changes in policy
> or any other information he wanted communicated to
> regional and branch managers in regions 8-13. I
> communicated policy updates and other information to
> regional and branch managers via email, at least on a
> weekly basis, if not more frequently.

(Akers Dec., dkt. #194, at ¶9,11).

To demonstrate just how prevalent these practices were and how well known it was throughout Cleary, Plaintiffs have prepared an organizational chart documenting the evidence Plaintiffs have received in support of this Motion. (Parsons Dec., Ex. 6, Cleary Organizational Chart). The chart reveals that current and former field crew employees from every single Cleary region were required to perform uncompensated work. (Id.). Significantly, the chart reveals testimony from field crew employees, branch managers, and corporate officers from Regions 8-13 which encompass or have encompassed during the statutory period branches in Wisconsin, Iowa, Minnesota, and Illinois. (Id.).

Sapon, Stinski and Akers' testimony that, as a result of Todd Montgomery's instructions, they directed regional and branch managers to require field crew employees to report to the branch office each morning and attend production meetings is reinforced by internal email correspondence and testimony between regional and branch managers throughout the country in 7 of Cleary's 9 Regions. (Sapon Dec., dkt. # 192; Stinski Dec., dkt. # 193; Akers Dec., dkt. #194; Parsons Dec., Ex. 4, 5). These internal communications produced in response to Plaintiffs' discovery requests clearly reveal a corporate-wide practice, understood by regional and branch managers, and enforced over the course of the statutory period.

16

Emails circulated between district managers and branch managers demonstrate that district managers enforced this Cleary policy by communicating the mandatory nature of the morning production meetings to branch managers. These emails establish that the morning meeting requirement was common at all branches in these regions, and a policy that originated with Cleary management.

### (1) Region 2 (Western States)

Region 2 District Manager Von Dell Erickson emailed branch managers in his regions to "Make sure you have a plan in place for your crews today and discuss in your Friday morning production meeting." (Parsons Dec., Ex. 7, Bates 21841).

### (2)     Region 3 (Western States)

An email from Region 3 District Manager Don Herron instructs branch managers to "Have the crews start at 5:30…[w]e are still requiring daily production meetings." (Parsons Dec., Ex. 8, Bates 18851).

### (3)     Region 6 (Nebraska and Kansas)

Throughout the course of his employment, Region 6 Manager (and later Region 9 Manager), Justin Thompson sent several emails to branch managers relating to morning meetings:

> We address these items daily by having our morning meetings…[m]ake sure you are doing these daily or every three days if you are above 105% of production."

(Parsons Dec., Ex. 9, Bates 016912).

> I am a FIRM believer in the morning production meetings;"

(Parsons Dec., Ex. 10, Bates 016091).

17

Thompson also provided declaration testimony wherein he confirms the policies he expressed in his internal emails to Region 6 branch managers:

> Prior to November or December 2011, I instructed Region 6 branch managers to hold daily, mandatory morning crew meetings wherein all of the branch field employees were required to attend.
>
> [...]
>
> In November or December 2011, Cleary changed its policies regarding the mandatory, morning meetings so that only foremen were required to attend. Prior to this change, all field crew employees were required to attend morning meetings.
>
> [...]
>
> Branch managers that did not hold the mandatory morning meetings were subject to discipline as a result of their failure to follow Cleary's company policy. Discipline included written warnings and verbal reprimands, which reinforced that the morning meetings were mandatory.

(Thompson Dec., dkt. #196, at ¶6-7, 9).

### (4)    Region 8 (Northern Iowa and Minnesota)

Region 8 Manager David Steele "instructed Region 8 branch managers to hold daily mandatory morning crew meetings wherein all of the branch field employees were required to attend." (Steele Dec., dkt. # 42, at ¶6; Steele Depo., dkt. # 86, at 64:22-25 – 65:1-12).

The practice continued after Mr. Steele left Cleary as evidenced by Region 8 District Manager Jim Steinhoff's 2012 internal email correspondence to branch

18

managers stating, "Daily we are meeting with our crews in the morning and completing the agenda." (Parsons Dec., Ex. 11, Bates 19247).

In light of these instructions, former Region 8 branch managers held mandatory morning meetings. For instance, manager of the Cokato, Minnesota branch, Mike Irvin, "held daily, mandatory crew meetings wherein all of the Cokato branch field employees were required to attend. I held these meetings and required attendance by the entire Cokato branch field employee crew pursuant to Cleary policy and instructions from my supervisors. (Irvin Dec., dkt. # 35, at ¶¶ 5-6; Irvin Depo., dkt. # 178, at 60: 1-5; 125:2-5; 138:1-9). Mr. Irvin also testified that his regional manager prior to David Steele, Greg Westendorf, instructed him that all crew members were required to attend mandatory morning meetings. (Id. at 139:5-13).

Region 8, Waverly, Iowa Branch Manager Brian Jorgenson also held production meetings every morning as indicated in his 2011 email wherein he stated "I do production meetings everyday." (Parsons Dec., Ex. 12, Bates 007065).

(5)    **Region 9 (Wisconsin and Michigan)**

Email correspondence from Region 9 District Manager Phil Walter, also indicates that meeting with crews daily is a job requirement for Branch Managers. (Parsons Dec., Ex. 13, Bates 19555).

(6)    **Region 12-13**

Regional Manager Greg Hodges "instructed Region 12-13 branch managers to hold daily, mandatory morning crew meetings wherein all of the branch field

19

employees were required to attend. Attendance was mandatory for all branch field employee crew." (Hodges Dec. dkt. # 90, at ¶7; Hodges Depo., dkt. # 176, at 109:19-25; 110:18-22).

Similarly, Region 12 Manager Chris Grayson emailed branch managers and explained that "If your office is over 105% in production…you only have to meet with your crew at the start of the day to do your production meeting on Monday, Wednesday, and Friday." (Parsons Dec., Ex. 14, Bates 18470).

These communications reveal that the directives issued from Todd Montgomery did indeed make their way down to regional and branch managers to be communicated to field crew employees.

**C.  Field Crew Employees Followed the Instructions of Their Supervisors and Reported to the Branch Office To Perform Work**

Field crew employees who worked throughout the country, including at branches in Minnesota, Wisconsin, Illinois, and Iowa report that they were instructed by their branch managers to report to their branch offices daily to attend morning meetings and perform work and did so pursuant to those instructions. Indeed, declaration and deposition testimony from seventy-five field crew employees from forty-nine branch offices confirm that these directives, which came from Todd Montgomery, through GMOs to regional and branch managers, were followed on a daily basis. (Deposition of Craig Krantz ("Krantz Depo."), dkt. #184, at 43:1-4; Deposition of Adam Bubke ("Bubke Depo."), dkt. #180, at 50:21-23; Deposition of Ryan Dziedzic ("Dziedzic Depo."), dkt. #181, at 48:9-13, 49:7-8, 49:13-21, 41:17-18; 43:20-23; Deposition of Eric Holevatz ("Holevatz Depo."), dkt. #175, at 36:23-37:3;

Deposition of Curtis Sitzmann ("Sitzmann Depo."), dkt. #188, at 73:11-15; Deposition of Jesse Kolosik ("Kolosik Depo."), dkt. #183, at 60:10-11; Deposition of Daniel Lamke ("Lamke Depo."), dkt. #185, at 54:7-8; Declaration of Patrick Anderson ("Anderson Dec."), dkt. # 288, at ¶ 8; Declaration of Robert Armstrong ("Armstrong Dec."), dkt. #199, at ¶ 8; Declaration of Nicklas Ashman ("Ashman Dec."), dkt. #34, at ¶¶ 6-8; Declaration of Bryan Bakley ("Bakley Dec."), dkt. #200, at ¶ 8; Baumgardner Dec., dkt. #197, at ¶ 5; Declaration of Peter Bengs ("Bengs Dec."), dkt. #201, at ¶ 8; Declaration of Steven Berndt ("Berndt Dec."), dkt. #41, at ¶8; Berndt Depo., dkt. # 174, at 45-47:12-21; 49-54:9-13; 65:18-23; 68-69:19-10; 74-76:18-4; 109-111:16-1; 111:11-25; Declaration of Kenneth Bigley ("Bigley Dec."), dkt. #202, at ¶ 8; Declaration of Henry Brix ("Brix Dec."), dkt. #205, at ¶ 8; Declaration of Brian Bouche ("Bouche Dec."), dkt. #203, at ¶ 8; Declaration of Michael Bradford ("Bradford Dec."), dkt. #204, at ¶ 8; Brah Dec. at ¶6; Declaration of  Michael Brownrigg ("Brownrigg Dec."), dkt. #206, at ¶ 8; Deposition of Adam Bubke ("Bubke Depo."), dkt. #180, at 50:21-23; Declaration of Thomas Buchanan ("Buchanan Dec."), dkt. #207, at ¶8; Declaration of Michael Buckholtz ("Buckholtz Dec."), dkt. #208, ¶ 8; Declaration of Jeffrey Bushnell ("Bushnell Dec."), dkt. #209, at ¶ 9; Declaration of Albert Byington ("Byington Dec."), dkt. #210, at ¶7; Declaration of Darcey Chapman ("Chapman Dec."), dkt. #211, at ¶ 8; Declaration of Chuck Clark ("Clark Dec."), dkt. #212 at ¶ 8; Declaration of Josh Cleveland ("J. Cleveland Dec."), dkt. #213, at ¶7; Declaration of William Cleveland  ("W. Cleveland Dec."), dkt. #198, at ¶ 5; Declaration of Jordan Daugherty ("Daugherty Dec."), dkt. #215, at ¶ 8;

Declaration of Christopher Day ("Day Dec."), dkt. #216, at ¶ 8; Declaration of John

Dees III ("Dees III Dec."), dkt. #217, at ¶7; Declaration of Donovan Delgado

("Delgado Dec."), dkt. #218, at ¶ 6; Declaration of Shane Dixon ("Dixon Dec."), dkt.

#219, at ¶8; Declaration of Greg Downey ("Downey Dec."), dkt. #220, at ¶7;

Declaration of Justin Dudek ("Dudek Dec."), dkt. #221, at ¶7; Declaration of Ryan

Dziedzic ("Dziedzic Dec."), dkt. #37, at ¶¶ 6-8; Deposition of Ryan Dziedzic

("Dziedzic Depo."), dkt. #181, at 48:9-13; Declaration of David Espinoza ("Espinoza

Dec."), dkt. #222, at ¶ 8; Declaration of Josh Ferrell ("Ferrell Dec."), dkt. #224, at ¶¶

5-7; Declaration of Justin Fiedler ("Fiedler Dec."), dkt. #225, at ¶ 8; Declaration of

James Finch ("Finch Dec."), dkt. #226, at ¶8; Declaration of Anthony Fisher ("A.

Fisher Dec."), dkt. #228, at ¶ 8; Declaration of Tyler Fisher ("T. Fisher Dec."), dkt.

#227, at ¶ 7; Declaration of Nicholas Ford ("Ford Dec."), dkt. #229, at ¶ 7;

Declaration of Jacob Frasier ("Frasier Dec."), dkt. #230, at ¶ 7; Declaration of

Samuel Gardea ("Gardea Dec."), dkt. #231, at ¶ 8; Declaration of Daniel Giacalone

("Giacalone Dec."), dkt. #45, at ¶¶ 5-8; Declaration of Justin Goble ("Goble Dec."),

dkt. #232, at ¶ 8; Declaration of Mark Gold ("Gold Dec."), dkt. #233, at ¶ 8;

Declaration of Kevin Greenman ("Greenman Dec."), dkt. #234, at ¶ 8; Declaration of

Jesus Gutierrez Sr. ("Gutierrez Dec."), dkt. #235, at ¶¶ 6, 8; Declaration of Justin

Hamilton ("Hamilton Dec."), dkt. #236, at ¶¶ 6, 8; Declaration of Terry Haney

("Haney Dec."), dkt. #237, at ¶¶ 6, 8; Declaration of Justin Hansen ("Hansen Dec."),

dkt. #238, at ¶ 7; Declaration of Mike Harmon ("Harmon Dec".), dkt. #239, at ¶¶ 6,

8; Declaration of Eric Holevatz ("Holevatz Dec."), dkt. #39, at ¶ 9; Deposition of Eric

Holevatz ("Holevatz Depo."), dkt. #175, at 36:23-37:3; Declaration of Charles
Hillesheim ("Hillesheim Dec."), dkt. # 290, at ¶ 8; Declaration of Jared Kirkendall
("Kirkendall Dec."), dkt. #241, at ¶¶ 6-7; Declaration of Cody Kirkeng ("Kirkeng
Dec."), dkt. #242, at ¶¶ 6, 8; Declaration of Ira Knudtson ("Knudtson Dec."), dkt.
#243, at ¶ 8; Deposition of Craig Krantz ("Krantz Depo."), dkt. #184, at 43:3-4;
Declaration of Bruce Kuechler ("Kuechler Dec."), dkt. #244, at ¶¶ 6-7; Declaration of
Seth Labarge ("Labarge Dec."), dkt. #245, at ¶ 8; Declaration of Daniel Lamke
("Lamke Dec."), dkt. #44, at ¶¶ 6, 8; Declaration of Mike Lewellen ("Lewellen Dec."),
dkt. #246, at ¶¶ 6-7; Declaration of Christian Lisle ("Lisle Dec."), dkt. #247, at ¶¶ 6-
7; Declaration of Michael Lopez ("Lopez Dec."), dkt. #248, at ¶ 8; Declaration of
David Mansfield ("Mansfield Dec."), dkt. #249 ,at ¶ 7; Declaration of Michael
Marten ("Marten Dec."), dkt. #250, at ¶ 8; Declaration of Javier Matias ("Matias
Dec."), dkt. #251 at ¶¶ 6-7; Declaration of Dave Maxwell ("Maxwell Dec."), dkt.
#252, at ¶¶ 6-7; Declaration of Josh McClure ("McClure Dec."), dkt. #253, at ¶¶ 6, 8;
Declaration of James Merritt ("J. Merritt Dec."), dkt. #254, at ¶ 7; Declaration of
Randy Ray Merritt ("R. Merritt Dec."), dkt. #262, at ¶ 8; Declaration of Samuel
Peeler ("Peeler Dec."), dkt. #255, at ¶¶ 6-8; Declaration of Woodrow Pester ("Pester
Dec."), dkt. #256, at ¶¶ 6-8; Declaration of Raymond Peterson ("Peterson Dec."), dkt.
#257, at ¶¶ 6-8; Declaration of Michael Phillips ("M. Phillips Dec."), dkt. #258, at ¶¶
5-7; Declaration Michael Presley ("Presley Dec."), dkt. #259, at ¶¶ 6-8; Declaration
of Rodney Priest ("Priest Dec."), dkt. #260 at ¶ 7; Declaration of Alfredo Ramirez
("Ramirez Dec."), dkt. #261, at ¶¶ 6-8; Declaration of Bobby Redmer ("Redmer

Dec."), dkt. #263, at ¶¶ 6-8; Declaration of Roy Reed ("Reed Dec."), dkt. #264, at ¶¶ 6-8; Declaration of Jay Ricke ("Ricke Dec."), dkt. #265, at ¶ 5; Declaration of Alan Ritter ("Ritter Dec."), dkt. #266, at ¶¶ 6-7; Declaration of Kyle Rupp ("Rupp Dec."), dkt. #267, at ¶ 7; Declaration of Xavier Saccomanno ("Saccomanno Dec."), dkt. #268, at ¶¶ 5-7; Declaration of Roberto Sandoval ("Sandoval Dec."), dkt. #269, at ¶ 8; Declaration of Mitch Schultze ("Schultze Dec."), dkt. #38, at ¶¶ 6-8; Declaration of David Skillings ("Skillings Dec."), dkt. #270, at ¶¶ 5-7; Deposition of Curtis Sitzmann ("Sitzmann Depo."), dkt. #188, at 68:8-13; Declaration of Kyle Smith ("K. Smith Dec."), dkt. #271, at ¶¶ 6-7; Declaration of Ryan Smith ("R. Smith Dec."), dkt. #40, at ¶ 8; Declaration of Stanley Smith ("S. Smith Dec."), dkt. #272, at ¶ 8; Declaration of Chris Spears ("Spears Dec."), dkt. #273, at ¶ 8; Declaration of Ryan Steere ("Steere Dec."), dkt. #274, at ¶ 8; Declaration of Donald Strassemeier ("Strassemeier Dec."), dkt. #275, at ¶¶ 5-7; Declaration of Leroy Sylvester ("Sylvester Dec."), dkt. #276, at ¶8; Declaration of Joel Tebbe ("Tebbe Dec."), dkt. #277, at ¶¶ 6-8; Declaration of Ryan Toel ("Toel Dec."), dkt. #278, at ¶ 8; Declaration of Ismael Urbina ("Urbina Dec."), dkt. #279, at ¶¶ 6-8; Declaration of Lawrence Watkins ("Watkins Dec."), dkt. #280, at ¶ 8; Declaration of Michael Weber ("Weber Dec."), dkt. #281, at ¶ 7; Declaration of Thomas Wenzl ("Wenzl Dec."), dkt. #282, at ¶ 8; Declaration of James Wiles ("Wiles Dec."), dkt. #283, at ¶ 8; Declaration of Aric Williams ("Williams Dec."), dkt. #284, at ¶ 8; Declaration of Nick Wojtanek ("Wojtanek Dec."), dkt. #36, at ¶¶ 6-8; Declaration of Rodrigo Zavala

("Zavala Dec."), dkt. #285, at ¶ 8; Declaration of Aaron Zeleny ("Zeleny Dec."), dkt.

#286 at ¶ 8; Declaration of Kurt Zuelsdorf ("Zuelsdorf Dec."), dkt. #287 at ¶¶ 6-8.

### 1. Cleary field crew were required to perform work at branch offices each morning.

It was the practice and policy at all branches that when field crew employees

arrived at the branch office, as required each morning, they were to attend meetings

and perform work, such as loading trailers and crew trucks with supplies for the

day.  Pursuant to Todd Montgomery's instructions, GMOs and Assistant GMOs

directed regional managers who directed branch managers in this practice.

> "During my employment with Cleary, pursuant to
> Cleary policy, field crew employees were required to
> perform any work necessary to get ready for the day
> after attending the mandatory meeting at the branch
> office. This work included, but was not limited to,
> loading Cleary vehicles with construction supplies,
> hitching trailers, obtaining lumber or other necessary
> equipment from vendors and loading trailers. As the
> GMO, I verbally instructed both Regional and Branch
> Managers who reported to me that this work was
> mandatory and that they were to advise their field crew
> accordingly."

(Sapon Dec., dkt. #192, at ¶9).

> "As the Assistant General Manager of Operations, I
> instructed regional managers in regions 8-13 that all
> field personnel were required to report at the branch
> office to make sure that Cleary vehicles were ready for
> the workday…Todd Montgomery informed me that this
> work was to be performed by the field crew employees
> each morning."

(Akers Dec., dkt. #194, at ¶¶ 9-10).

> "[B]efore leaving for the job site, crew members were to
> restock tools, safety check of equipment, safety check of

25

vehicles and perform other work as instructed by the branch manager that may have been necessary for the coming day of work. I am aware of these requirements because my direct supervisor, Todd Montgomery, informed me of these expectations."

(Stinski Dec., dkt. #193, at ¶ 17).

"I instructed branch managers in this manner pursuant to Cleary policy and based on conversations I had with Cleary Vice President, Todd Montgomery. In addition to attending daily, mandatory morning meetings, Region 8 branch field crew employees were also required to perform work each morning prior to traveling to the job site including but not limited to: loading trailers, loading crew trucks, re-stocking Cleary crew trucks with supplies, hitching trailers, updating reports, and performing equipment safety checks."

(Steele Dec., dkt. #42, at ¶ 9).

"Region 12-13 Branch field crew employees were also required to perform work each morning prior to traveling to the job site including, but not limited to: loading trailers, loading crew trucks, re-stocking Cleary crew trucks with supplies, hitching trailers, updating reports, and performing equipment safety checks."

(Hodges Dec., dkt. # 90 at ¶ 9).

Prior to November or December 2011, field crew employees were often required to perform work at the branch office after the mandatory daily meeting and before leaving for the jobsite. This work included cleaning the branch's shop area, loading tools into the Cleary vehicles, and removing and replacing damages materials that were needed at the job site.

(Thompson Dec., dkt. #196, at ¶ 12).

In light of these instructions, field crew employees arrived each morning at the branch office and prepared the Cleary vehicles by gathering supplies necessary

to complete their construction tasks for the day and collecting the equipment which would be needed on the job site. This included loading materials such as ladders, extra lumber, steel cover sheets, air compressors, sawhorses, and generators. (Berndt Depo., dkt. 174, at 72-74:23-1; 84-85:13-4; 112:8-19; Brah Depo., dkt. #177, at 91:4-7; 98:6-13; Irvin Dec., dkt. #35, at ¶5; Irvin Depo., dkt. #178, at 132:9-17; 151:21-25; 152:15-20; 156:1-4; 158: 5-7; Krantz Depo., dkt. #184, at 47:19-24; Bubke Depo., dkt. # 180, at 113:10-13; Dziedzic Depo., dkt. # 181, at 54:24-55:12; Holevatz Depo., dkt. #175, at 40:17-21; Sitzmann Depo., dkt. # 188, at 75:4-10; 79:21-25; 82:25-83:4; Kolosik Depo., dkt. # 183, at 62:21-24; Lamke Depo., dkt. # 185, at 41:1-8; Anderson Dec. at ¶ 9; Armstrong Dec. at ¶ 9; Ashman Dec. at ¶ 9; Bakley Dec. at ¶ 9; Baumgardner Dec. at ¶ 10; Bengs Dec. at  ¶ 9; Berndt Dec. at ¶ 9; Bigley Dec. at ¶ 9; Brix Dec. at ¶ 9; Bouche Dec. at ¶ 9; Bradford Dec. at ¶ 9; Brah Dec. at ¶ 9; Brownrigg Dec. at ¶ 9; Bubke Dec. at ¶ 9; Buchanan Dec. at ¶ 9; Buckholtz Dec. at ¶ 9; Bushnell Dec. at ¶ 10; Byington Dec. at ¶ 8; Chapman Dec. at ¶ 9; Clark Dec. at ¶ 9; J. Cleveland Dec. at ¶ 8; W. Cleveland Dec. at ¶ 6; Declaration of Tony Dankert ("Dankert Dec."), dkt. #214 at  ¶ 9; Daugherty Dec.  at ¶ 9; Day Dec. at ¶ 9; Dees III Dec. at ¶ 8; Delgado Dec. at  ¶ 6; Dixon Dec. at ¶ 9; Downey Dec. at  ¶ 8; Dudek Dec. at ¶ 8; Dziedzic Dec. at ¶ 9; Espinoza Dec. at ¶ 8; Declaration of Daniel Farrell ("Farrell Dec."), dkt. #223 at  ¶ 8; Ferrell Dec. at  ¶ 8; Fiedler Dec. at ¶ 9; Finch Dec. at ¶ 9; A. Fisher Dec. at ¶ 9; T. Fisher Dec. at ¶ 8; Ford Dec. at ¶ 8; Frasier Dec. at ¶ 8; Gardea Dec. at ¶ 9; Giacalone Dec. at ¶ 9; Goble Dec. at ¶ 9; Gold Dec. at ¶ 9; Greenman Dec. at ¶ 9; Gutierrez Dec. at ¶ 9; Hamilton Dec. at ¶ 8; Haney Dec. at ¶

9; Hansen Dec. at ¶ 8; Harmon Dec. at ¶ 9; Hillesheim Dec. at ¶ 9; Declaration of

Eric Holevatz ("Holevatz Dec."), dkt. #39 at ¶ 9;  M. Johnson Dec. at ¶ 9;

Kirkendall Dec. at ¶ 8; Kirkeng Dec. at ¶ 9; Knudtson Dec. at ¶ 9; Kuechler Dec. at

¶ 8; Labarge Dec. at ¶ 9; Lamke Dec. at ¶ 9; Lewellen Dec. at ¶ 8; Lisle Dec. at ¶ 8;

Lopez Dec. at ¶ 9; Mansfield Dec. at ¶ 8; Marten Dec. at ¶ 9; Matias Dec. at ¶ 8;

Maxwell Dec. at ¶ 8; McClure Dec. at ¶ 9; J. Merritt Dec. at ¶ 8; R. Merritt Dec. at

¶ 9; Peeler Dec. at ¶ 9; Pester Dec. at ¶ 9; Peterson Dec. at ¶ 9; M. Phillips Dec. at

¶ 8; Presley Dec. at ¶ 9; Priest Dec. at ¶ 8; Ramirez Dec. at ¶ 9; Redmer Dec. at ¶ 9;

Reed Dec. at ¶ 9; Ricke Dec. at ¶ 8; Ritter Dec. at ¶ 8; Rupp Dec. at ¶ 8; Saccomanno

Dec. at ¶ 8; Sandoval Dec. at ¶ 9; Schultze Dec. at ¶¶ 9-10; Declaration of Curtis

Sitzmann ("Sitzmann Dec."), dkt. #43 at ¶ 9; Skillings Dec. at ¶ 8; K. Smith Dec. at

¶ 8; R. Smith Dec. at ¶ 9; S. Smith Dec. at ¶ 9; Spears Dec. at ¶ 9; Steere Dec. at ¶

9; Strassemeier Dec. at ¶ 8; Sylvester Dec. at ¶ 9; Tebbe Dec. at ¶ 9; Toel Dec. at ¶

9; Urbina Dec. at ¶ 9; Watkins Dec. at ¶ 9; Weber Dec. at ¶ 8; Wenzl Dec. at ¶ 9;

Wiles Dec. at ¶ 9; Williams Dec. at ¶ 9; Wojtanek Dec. at ¶ 9; Zavala Dec. at ¶ 9;

Zeleny Dec. at ¶ 9; Zuelsdorf Dec. at ¶ 9).

### 2. Cleary field crew were required to perform work at the branch office after returning from the jobsite at the end of the day.

Field crew employees were also required to perform work at the branch office

when they returned from a jobsite at the end of the day. (Anderson Dec. ¶ 10;

Armstrong Dec. ¶ 10; Ashman Dec. ¶ 11; Bakley Dec. ¶ 10; Baumgardner Dec. ¶ 12;

Bengs Dec. ¶ 10; Berndt Dec. ¶ 11; Berndt Depo. at 9:10-15; Bigley Dec. ¶ 10; Brix

Dec. ¶ 10; Bouche Dec. ¶ 10; Bradford Dec. ¶ 10; Brah Dec. ¶ 11; Brownrigg Dec. ¶

11; Buchanan Dec. ¶ 10; Buckholtz Dec. ¶ 10; Bushnell Dec. ¶ 11; Chapman Dec. ¶ 10; Clark Dec. ¶ 11; W. Cleveland Dec. ¶ 13; Daugherty Dec. ¶ 10; Dees III Dec. ¶ 9; Delgado Dec. ¶ 7; Dixon Dec. ¶ 10; Downey Dec. ¶ 9; Dudek Dec. ¶ 9; Dziedzic Dec. ¶ 11; Espinoza Dec. ¶ 9; Farrell Dec. ¶ 9; Ferrell Dec. ¶ 9; Finch Dec. ¶ 10; A. Fisher Dec. ¶ 10; T. Fisher Dec. ¶ 9; Ford Dec. ¶ 9; Frasier Dec. ¶ 9; Giacalone Dec. ¶ 11; Goble Dec. ¶ 10; Gold Dec. ¶ 10; Greenman Dec. ¶ 10; Gutierrez Dec. ¶ 10; Hamilton Dec. ¶ 10; Hansen Dec. ¶ 9; Harmon Dec. ¶ 10; Hillesheim Dec. ¶ 10; Holevatz Dec. ¶ 11;  M. Johnson Dec. ¶ 10; Kirkendall Dec. ¶ 9; Kirkeng Dec. ¶ 10; Knudtson Dec. ¶ 10; Labarge Dec. ¶ 10; Lamke Dec. ¶ 11; Lewellen Dec. ¶ 9; Lisle Dec. ¶ 11; Lopez Dec. ¶ 10; Marten Dec. ¶ 10; Matias Dec. ¶ 9; Maxwell Dec. ¶ 9; J. Merritt Dec. ¶ 9; R. Merritt Dec. ¶ 10; Pester Dec. ¶ 10; Peterson Dec. ¶ 10; M. Phillips Dec. ¶ 9; Presley Dec. ¶ 10; Priest Dec. ¶ 9; Ramirez Dec. ¶ 11; Reed Dec. ¶ 10; Ricke Dec. ¶ 9; Ritter Dec. ¶ 9; Rupp Dec. ¶ 9; Saccomanno Dec. ¶ 9; Sandoval Dec. ¶ 10; Sitzmann Dec. ¶ 11; Skillings Dec. ¶ 9; R. Smith Dec. ¶ 11; S. Smith Dec. ¶ 10; Spears Dec. ¶ 10; Steere Dec. ¶ 12; Sylvester Dec. ¶ 10; Tebbe Dec. ¶ 10; Toel Dec. ¶ 10; Urbina Dec. ¶ 11; Watkins Dec. ¶ 10; Weber Dec. ¶ 9; Wenzl Dec. ¶ 10; Wiles Dec. ¶ 10; Williams Dec. ¶ 10; Wojtanek Dec. ¶ 11; Zavala Dec. ¶ 10; Zuelsdorf Dec. ¶ 10).  Because crews transported tools and supplies back and forth from the branch office and the job site on a daily basis, at the end of the workday, trucks and supplies needed to be returned to the branch office and secured. (Bullock Depo., dkt. # 32, at 193:3-6, "The tools are transported back and forth on the Cleary crew truck."; Parsons Dec., Ex. 15, Administrative Employee Handbook, AD-11a,

"All production vehicles are to be parked at the office upon completion of work for the day;" Parsons Dec., Ex. 16, Branch Manager Assessment, Bates 4567-68, describing Cleary policy requiring crew equipment and truck to be secured at the branch office each night; Bullock Depo., dkt. # 32, at 193:3-194:11, "We ask that [the tools] be put back on the truck because we don't want them stolen.").

Specifically, Cleary employees were required to unload materials and equipment that would not be used on the job the next day. This was work that needed to be done each evening in order for crews to be able to get moving the next morning.  (Berndt Depo., dkt. # 33, at 9:10-15; Bubke Depo., dkt. # 180, at 90:17-91:4; Holevatz Depo., dkt. # 175, at 58:8-11; Sitzmann Depo., dkt. # 188, at 87:21-25, 90:12-20; Kolosik Depo., dkt. # 183, at 76:3-25; Skillings Dec., dkt. # 271, at ¶9, "Some days after returning to the Ellsworth or Delta branch offices, Cleary required that we unload materials, drop off skid steers and trailers, and perform other work;" Lewellen Dec. ¶9 "When I returned to the Castle Bluff branch office at the end of the day, Cleary required that we unload the Bobcats, clean out vehicles, and replace equipment and supplies;" Delgado Dec. ¶ 7 "When we returned to the Scottsbluff branch office at the end of the day, Cleary required that we unload the trucks, unhitch the trailers, and service equipment;" Anderson Dec. ¶ 10; Armstrong Dec. ¶ 10; Ashman Dec. ¶ 11; Bakley Dec. ¶¶ 12, 14; Baumgardner Dec. ¶ 12; Bengs Dec. ¶ 10; Berndt Dec. ¶ 11; Bigley Dec. ¶¶ 10-11; Brix Dec. ¶ 10; Bouche Dec. ¶¶ 10-11; Bradford Dec. ¶ 10; Brah Dec. ¶ 11; Brownrigg Dec. ¶¶ 11-12; Buchanan Dec. ¶¶10, 12; Buckholtz Dec. ¶ 10; Bushnell Dec. ¶ 11; Chapman Dec. ¶¶ 10, 12; Clark Dec. ¶

30

11; W. Cleveland Dec. ¶ 13; Daugherty Dec. ¶ 10; Dees III Dec. ¶ 9; Delgado Dec. ¶ 7; Dixon Dec. ¶ 10; Downey Dec. ¶ 9; Dudek Dec. ¶ 9; Dziedzic Dec. ¶ 11; Espinoza Dec. ¶ 9; Farrell Dec. ¶ 9; Ferrell Dec. ¶ 11; Finch Dec. ¶ 10; A. Fisher Dec. ¶ 10; T. Fisher ¶ 9; Ford Dec. ¶ 9; Frasier Dec. ¶ 9; Giacalone Dec. ¶ 11; Goble Dec. ¶ 10; Gold Dec. ¶ 9; Greenman Dec. ¶ 10; Gutierrez Dec. ¶¶ 10-11; Hamilton Dec. ¶ 10; Hansen Dec. ¶ 9; Harmon Dec. ¶ 10; Hillesheim Dec. ¶ 10; Holevatz Dec. ¶ 11;  M. Johnson Dec. ¶ 10; Kirkendall Dec. ¶ 9; Kirkeng Dec. ¶ 10; Knudtson Dec. ¶ 10; Labarge Dec. ¶ 10; Lamke Dec. ¶ 11; Lewellen Dec. ¶ 9; Lisle Dec. ¶ 9; Lopez Dec. ¶ 10; Marten Dec. ¶ 10; Matias Dec. ¶ 9; Maxwell Dec. ¶ 10; J. Merritt Dec. ¶ 9; R. Merritt Dec. ¶ 10; Pester Dec. ¶ 10; Peterson Dec. ¶ 10; M. Phillips Dec. ¶ 9; Presley Dec. ¶ 10; Priest Dec. ¶ 9; Ramirez Dec. ¶ 11; Reed Dec. ¶ 10; Ricke Dec. ¶ 9; Ritter Dec. ¶ 9; Rupp Dec. ¶ 9; Saccomanno Dec. ¶ 9; Sandoval Dec. ¶ 10; Sitzmann Dec. ¶ 11; Skillings Dec. ¶ 9; R. Smith Dec. ¶ 11; S. Smith Dec. ¶ 10; Spears Dec. ¶ 10; Steere Dec. ¶ 12; Sylvester Dec. ¶ 10; Tebbe Dec. ¶ 10; Toel Dec. ¶ 10; Urbina Dec. ¶ 11; Watkins Dec. ¶ 10; Weber Dec. ¶ 9; Wenzl Dec. ¶ 10; Wiles Dec. ¶ 10; Williams Dec. ¶ 10; Wojtanek Dec. ¶ 11; Zavala Dec. ¶ 10; Zuelsdorf Dec. ¶ 10).

## II.   CLEARY CORPORATE DOCUMENTS REINFORCE AND REAFFIRM THE PRACTICES DICTATED BY TODD MONTGOMERY REQUIRING FIELD CREW EMPLOYEES TO REPORT TO THE BRANCH OFFICE EACH MORNING AND ATTEND DAILY PRODUCTION MEETINGS.

In addition to testimony and correspondence from former corporate level executives and managers, many of the documents contained in Cleary's corporate handbooks confirm these directives with regard to the daily, mandatory nature of these meetings. For example, the Regional Manager Training Materials state that crews need to "Be there for the 6:30 am Crew meeting." (Parsons Dec., Ex. 17, Bates 003924-25). Branch managers are to review the "area fuel cost with the crews every morning to determine where to purchase fuel" and branch secretaries are to research and print out copies of weather forecasts for the branch manager to review "prior to the crew meeting each morning." (Parsons Dec., Ex. 1, Branch Operations Manual, 000602 and 000576). Other corporate documents express similar sentiments:

> Be present in the office every morning at 6:30 am to meet with the crews (or earlier as necessary).

(Parsons Dec., Ex. 22, Branch Assistant Manager Job Description, Bates 004024).

> Per policy, Branch Managers are to meet with their crews/Foremen minimally five mornings per week.

(Parsons Dec., Ex. 16, Branch Manager Assessment, Bates 4567-68).

> [A]ll Crew meetings should be concluded and Crews on the way to the job site early enough" to start work by first light.

(Parsons Dec., Ex. 3, Field Employee Handbook, Bates 003510).

Significantly, the Branch Manager Policy Manual explicitly reminds branch managers that:

> The most successful managers meet with the crews at least 5 times per week. As the Branch Manager, you may

> elect to start your crew meetings earlier than 6:30 am, we
> encourage you to do so if it makes sense.

(Parsons Dec., Ex. 1, Branch Operations Manual, Cleary000706).

Cleary's policy of requiring field crew employees to report to the branch office each morning and attend morning meetings was pervasive and corporate-wide. The directives came from the corporate office, usually Todd Montgomery, and were disseminated to field crew employees through regional and branch managers accordingly.

## III. CLEARY FIELD CREW MEMBERS WERE NOT PAID THEIR REGULAR OR OVERTIME WAGES FOR ALL HOURS SPENT PERFORMING MANDATORY DAILY WORK AT THE BRANCH OFFICE.

Despite Cleary's policy and practice of requiring work at the job site prior to and after traveling to the job site, Cleary's written pay policy states that field crew employees are not to be paid until they arrive at the job site. (Berndt Depo., dkt. # 174.8, Ex. 8, 00198-200). The combination of Todd Montgomery's directives and the written policy of not paying until crews arrived at the job site resulted in field crew employees performing uncompensated work at the branch office every day.

Cleary's policy of failing and/or refusing to pay field crew employees for work at the branch offices is understood and enforced at every level of the Cleary organization:

Cleary's corporate level employees understood that this work was not to be compensated.  Former GMO George Sapon has testified:

> During our private discussions, Todd Montgomery explicitly
> directed me to direct regional managers and branch managers

33

not to pay field crew employees for the following mandatory work:

a. Mandatory morning production meetings held at the branch offices;
b. Work performed at the branch office after mandatory meetings but prior to leaving for the job site;
c. Travel time between the branch office and the job site;
d. Work performed at the branch office at the end of the day after returning to the job site.

(Sapon Dec., dkt. # 192, at ¶9). Similarly, Former GMO Aaron Stinski offered that:

Because the only hours allotted in the budget were those hours spent at the jobsite (or drive time only for the driver), employees were not to be paid for time spent performing work away from the jobsite, including time spent at morning meetings and performing other work prior to arrival at the jobsite. I instructed regional and branch managers to this effect based on these conversations with Todd Montgomery.

(Stinski Dec., dkt. # 193, at ¶15).

Finally, Cleary's former Workers' Compensation and DOT Coordinator Lisa Gonsalves testified that:

[C]rew members were required to show up for mandatory morning meetings but were not being paid for time spent working at those meetings. The hours…were not paid pursuant to Cleary policy and Todd Montgomery's instructions.

(Gonsalves Dec., dkt. # 195, at ¶12).

Beyond this, the regional managers tasked with enforcing Cleary's policy requiring attendance at meetings and performance of work at the branch offices, were aware that crew members were not paid for this time.

34

David Steele, former manager for Region 8 testified that

> "As a Regional Manager, pursuant to Cleary
> policy, I instructed Region 8 branch managers not
> to pay employees for this time they spent each
> morning at the branch office, whether performing
> work or attending meetings [...]."

(Steele Dec., dkt. #42, at ¶ 7).

Justin Thompson, former manager for Region 6, has stated:

> Prior to November or December 2011 and
> pursuant to Cleary policy, I directed branch
> managers not to pay field crew employees for
> attendance at the daily, mandatory meetings. I
> did so at the directive of Todd Montgomery which
> he reiterated to me in multiple conversations
> throughout my time as Regional Manager of
> Region 6.

(Thompson Dec., dkt. # 196, at ¶ 11).

Thompson also testifies that he directed branch managers not to pay field

crew employees for time spent performing work each morning at the branch office

after the mandatory daily meeting and before leaving for the jobsite. (Id. at ¶ 12).

Similarly, Greg Hodges, former regional manager for Regions 12 and 13 has

testified that:

> As a Regional Manager, pursuant to Cleary
> policy, I instructed Region 12-13 branch
> managers not to pay field employees for this time
> they spent each morning at the branch office,
> whether performing work or attending meetings.

(Hodges Dec., dkt. # 90, at ¶8).

Hodges also testified in his deposition to the following:

35

> Q:    And as far as you were concerned, when you were regional
>
> manager at Cleary, was it Cleary's policy to pay people for
>
> their work time?
>
> A:    Their policy, my understanding of their policy was they
>
> paid the people when they got to the job site.

(Hodges Depo., dkt. # 176, at 119:2-6).

Cleary Branch Managers similarly understood that this work time for field crew employees was uncompensated.

> For instance, Branch Manager Greg Baumgardner testifies that:
>
> > During my entire tenure as Branch Manager,
> > field crew employees were never paid for
> > attending the daily, mandatory meetings at the
> > Galesburg branch office with the exception of one
> > fifteen to thirty minute safety meeting each
> > month.
> >
> > […]
> >
> > During my entire tenure as Branch Manager,
> > field crew employees were never paid for the time
> > spent loading trucks at the Galesburg branch or
> > performing other work activities at the Galesburg
> > branch prior to or after the daily mandatory
> > meetings.
> >
> > […]
> >
> > During my entire tenure as Branch Manager,
> > field crew employees were never paid for the time
> > spent traveling between the Galesburg branch
> > office and job sites.

(Baumgardner Dec., dkt. # 197, at ¶9-11).

36

Sandwich, Illinois Branch Manager William Cleveland

testified that:

> Pursuant to Cleary policy, the foreman of the Sandwich
> branch field employee crew recorded the work hours of
> each field employee on a time card. Also pursuant to
> Cleary policy, the Sandwich branch foremen did not
> record field employees' time until the field employees
> arrived at the job site at which they were scheduled to
> work for the day. In accordance with Cleary policy, the
> foremen never recorded time spent at mandatory
> morning meetings, time spent loading or unloading the
> crew truck or time spent traveling to and from the
> Sandwich branch office, except for the driver who was
> paid for travel time.

(W. Cleveland Dec., dkt. # 198, at ¶ 8).

Cleveland, and other branch managers further testify that during their

tenures as branch managers, field crew employees were never paid for attending

mandatory morning meetings, for time spent loading or unloading crew trucks, or

for time spent traveling between the branch office and the jobsite. (W. Cleveland

Dec., dkt. #198, at ¶¶ 10-12; Irvin Dec., dkt. # 35, at ¶¶ 9-11; Brah Dec., dkt. # 33,

at ¶¶ 9-11; Baumgardner Dec., dkt. # 197, at ¶¶ 7, 9-11).

Finally, the field crew employees from branch offices throughout the country

confirm that they were not paid for any time spent working other than time spent

at the jobsite. (Skillings Dec. ¶9; Griffin Dec. ¶11; Williams Dec. ¶ 12; Bakely Dec. ¶

12; Bigley Dec. ¶ 11; Bouche Dec. ¶ 11; Brownrigg Dec. ¶ 12; Buchanan Dec. ¶ 12;

Byington Dec. ¶ 11; Chapman Dec. ¶ 12; Clark Dec. ¶ 12; Cleveland Dec. ¶ 11;

Dankert Dec. ¶ 12; Day Dec. ¶ 12; Delgado Dec. ¶ 8; Downey Dec. ¶ 11; Dudek Dec.

¶ 11; Espinoza Dec. ¶ 11; Sitzmann Dec. ¶ 11; Giacalone Dec. ¶ 11; Lamke Dec. ¶ 11; Holevatz Dec. ¶ 11; Gifford Dec. ¶ 10; Schultze Dec. ¶ 11; Wojtanek Dec. ¶ 11; R. Smith Dec. ¶ 11; Berndt Dec. ¶ 11; Ashman Dec. ¶ 11; Farrell Dec. ¶ 11; Ferrell Dec. ¶ 11; Fisher Dec. ¶ 11; Ford Dec. ¶ 11; Frasier Dec. ¶ 11; Goble Dec. ¶ 12; Gold Dec. ¶ 12; Gutierrez Dec. ¶ 11; Hamilton Dec. ¶ 11; Haney Dec. ¶ 11; Hansen Dec. ¶ 11; Harmon Dec. ¶ 11; M. Johnson Dec. ¶ 12; Kirkendall Dec. ¶ 10; Kirkeng Dec. ¶ 12; Knudtson Dec. ¶ 12; Kuechler Dec. ¶ 10; Lisle Dec. ¶ 11; Matias Dec. ¶ 11; Maxwell Dec. ¶ 11; McClure Dec. ¶ 12; Peeler Dec. ¶ 12; Pester Dec. ¶ 11; Peterson Dec. ¶ 12; Phillips Dec. ¶ 11; Presley Dec. ¶ 12; Ramirez ¶ 11; Merritt Dec. ¶ 12; Reed Dec. ¶ 11; Ricke Dec. ¶ 11; Ritter Dec. ¶ 10; Rupp Dec. ¶ 11; Skillings Dec. ¶ 11; K. Smith ¶ 11; Sylvester Dec. ¶ 12; Tebbe Dec. ¶ 12; Urbina ¶ 11; Weber Dec. ¶ 11; Wenzl Dec. ¶ 12; Zuelsdorf Dec. ¶ 12).

## IV. CLEARY NON-DRIVER FIELD CREW MEMBERS WERE NOT COMPENSATED FOR TRAVEL TIME TO THE JOBSITE AFTER PERFORMING WORK AT THE BRANCH OFFICE EACH MORNING.

After arriving at the branch office, attending morning meetings and performing work, Cleary field crew employees rode in the company vehicle from the branch office to the job site. (Ashman Dec. ¶ 10; Berndt Dec. ¶ 10; Berndt Depo. at 43-45:8-11; Delgado Dec. ¶ 6; Dziedzic Dec. ¶ 10; Giacalone Dec. ¶ 10; Holevatz Dec. ¶ 10; Lamke Dec. ¶ 10; Sapon Dec. ¶ 8; Schultze Dec. ¶ 10; Sitzmann Dec. ¶ 10; R. Smith Dec. ¶ 10; Strassemeier Dec. ¶ 10; Wojtanek Dec. ¶ 10).  GMO George Sapon instructed his regional and branch managers that "traveling in the Cleary vehicle was mandatory and that they were to advise their field crew accordingly." (Sapon

Dec., dkt. # 192, at ¶ 8). If employees wished to drive their own vehicles, they had to obtain permission from a superior but it was only permitted when the crew member had a personal issue and needed to leave early on that day or if there was an extenuating circumstance. (Sapon Dec., dkt. # 192,  ¶8; Wojtanek Dec., dkt. # 36, at ¶ 10; Strassemeier Dec., dkt. # 276, at ¶ 10, Steele Depo., dkt. # 42, at 73:2-25; Hodges Depo., dkt. # 176, at at 123:14-20; Sitzmann Depo., dkt. # 188, at 74:20-25.).

Because Cleary refused to pay field crew employees except for time spent at the jobsite with the exception of the driver who was paid at a reduced driving rate, employees were not compensated for time spent traveling to and from the branch office and a jobsite within a certain distance from the branch office. (Anderson Dec. ¶ 11; Ashman Dec. ¶ 11; Baumgardner Dec. ¶ 11; Bengs Dec. ¶ 11; Berndt Dec. ¶ 11; Brah Dec. ¶ 10; Buchanan Dec. ¶ 11; Buckholtz Dec. ¶ 11; Byington Dec. ¶ 10; Chapman Dec. ¶ 11; Clark Dec. ¶ 10; J. Cleveland Dec. ¶ 10; Dankert Dec. ¶ 13; Delgado Dec. ¶ 9; Dixon Dec. ¶ 11; Downey Dec. ¶ 11;   Farrell Dec. ¶ 10; Fiedler Dec. ¶ 11; Frasier Dec. ¶¶ 10-11; Gardea Dec. ¶ 11; Giacalone Dec. ¶ 11; Goble Dec. ¶ 11; Gold Dec. ¶ 11; Hamilton Dec. ¶ 11; Haney Dec. ¶ 11; Harmon Dec. ¶ 11; Hodges Dec. ¶ 16;  Holevatz Dec. ¶ 11;  M. Johnson Dec. ¶ 11; Kirkendall Dec. ¶ 11; Kirkeng Dec. ¶ 11; Knudtson Dec. ¶ 11; Kuechler Dec. ¶ 10; Lewellen Dec. ¶ 10; Lisle Dec. ¶ 10; Marten Dec. ¶ 11; Maxwell Dec. ¶ 10; McClure Dec. ¶ 11; R. Merritt Dec. ¶ 11; Peeler Dec. ¶ 11; Pester Dec. ¶ 11; M. Phillips Dec. ¶ 10; Presley Dec. ¶ 12; Ramirez Dec. ¶ 12; Reed Dec. ¶ 10; Ritter Dec. ¶ 10; Rupp Dec. ¶ 10; Sapon Dec.

¶ 9; Sitzmann Dec. ¶ 11; Skillings Dec. ¶ 10; Steele Dec. ¶ 16; Strassemeier Dec. ¶ 10; Urbina Dec. ¶¶ 12-13; Wiles Dec. ¶ 11; Zavala Dec. ¶ 11; Zuelsdorf Dec. ¶ 12).

## ARGUMENT

### I.   CLEARY MAINTAINED A UNIFORM ILLEGAL PAY POLICY WHICH VIOLATES WISCONSIN, MINNESOTA, IOWA, AND ILLINOIS LAW

The Plaintiffs have presented evidence that Cleary's management created a policy of not compensating field crew employees for attending mandatory work-related meetings, performing work at branch offices prior to arriving at the job sites, and traveling between the branch office and job sites. The Plaintiffs have presented evidence that this policy was communicated by Cleary Vice President Todd Montgomery to his GMOs, who ensured that regional and branch managers implemented the policy. The Plaintiffs have presented evidence from 103 crew members and 53 branches as well as 4 branch managers, 3 regional managers and 3 GMOs, that this policy was implemented in Cleary branches nationwide, including branches in Wisconsin, Minnesota, Iowa, and Illinois.

Cleary's uniform pay policy is unquestionably a violation of Wisconsin, Minnesota, Iowa, and Illinois wage laws. Laws in each of these states require payment for time worked and payment of overtime wages. Because Cleary 's maintained a uniform policy of requiring employees to perform uncompensated work at branch offices prior to traveling to the job sites, class certification for these state law claims is merited.

II.   **CLEARY'S PAY POLICIES VIOLATED WISCONSIN, ILLINOIS, IOWA ,
AND MINNESOTA LAW**

A motion for class certification under Fed. R. Civ. P. 23 does not require a full

trial on the merits, but Plaintiffs must show that they can meet each requirement of

Rule 23 to a "preponderance of the evidence." Messner v. Northshore Univ.

HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012). While the Court need not conduct

a thorough review of the facts, there may necessarily be an overlap with some

questions as to the merits of the case in considering whether plaintiffs have met

their burden under Fed. R. Civ. P. 23. Wal-Mart Stores v. Dukes, 131 S. Ct. 2541,

2551, fn. 6 (2011).

The Plaintiffs' burden of proof at the class certification stage is not to prove

that the alleged illegal activity happened, but that this activity is capable of proof

which is common to the class as a whole. Messner, 669 F.3d at 818. Therefore, the

Court should consider whether the company-wide illegal pay policy demonstrated

by Plaintiffs constitutes a violation of Wisconsin, Illinois, Minnesota, and Iowa law,

which is subject to a common resolution. As it is the role of the jury to decide the

merits of the case, likelihood of success on the merits is not an appropriate basis for

denying class certification. Id. at 823.

Cleary's common, illegal pay policies have violated the laws of Wisconsin,

Illinois, Minnesota, and Iowa; common questions related to those violations which

predominate over individual issues, and which can be resolved through common

proof, pervade in this matter; namely, the validity of Cleary's pay policy.

Employers must compensate employees for all hours worked. Wis. Stat. §
109.03; 820 ILCS 115/3; Minn. Stat. § 181.101; Iowa Stat. 91A.3. This includes any
time where the employee is "suffered or permitted to work." Wis. Adm. Code DWD §
272.12(2)(a) ("Work not requested but suffered or permitted is work time; see also
Wis. Adm. Code DWD § 272.12(2)(a)(3), stating if management does not want work
to be performed, it is the duty of management to exercise its control, as "the mere
promulgation of a rule against such work is not enough"); 56 Ill. Adm. Code 210.110
("'Hours worked' means all the time an employee is required to be on duty, or on the
employer's premises, or at other prescribed places of work"); Minn. Adm. Rules
5200.0120(1) ("Hours worked include training time, call time, cleaning time, waiting
time, or any other time when the employer must be either on the premises of the
employer or involved in the performance of duties in connection with his or her
employment or must remain on the premises until work is prepared or available");
875 Iowa Admin. Code 215.3(13) ("In determining the total hours worked, the
employer must include all time the employee is required to be on the premises or on
duty…and all time the employee is suffered or permitted to work."). This also
includes time spent performing activities which are "integral and indispensable" to
the employee's "principal activity". IBP Inc. v. Alvarez, 546 U.S. 21, 37 (2005)
(applying the FLSA to interpret "hours worked").

Employers in these states are required to pay overtime. Wis. Stat. § 103.02;
Wis. Admin. Code DWD § 274.03 (requiring overtime for all hours worked over

forty); 820 ILCS 105/4(a) (requiring overtime for all hours worked over forty); Minn. Stat. § 177.25(1) (requiring overtime for all hours worked over forty-eight).

The time spent traveling between the Cleary branch offices and the job sites is also compensable. Under Wisconsin law, travel that is "all in a day's work" is compensable "where an employee is required to report at a meeting place to receive instructions or to perform other work there or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice." Wis. Admin. Code DWD § 272.12(2)(g)(5). Illinois law also incorporates the federal definition of compensable travel time from 29 CFR § 785.33-785.41, including "an employee's travel, performed for the employer's benefit." 56 Ill. Adm. Code I-b-210.110. Minnesota law requires compensation for all hours "when the employee must be either on the premises of the employer or involved in the performance of duties in connection with his or her employees." Minn. Adm. Code § 5200.0120(1). In Iowa, employees are entitled to compensation for time spent traveling between worksites if the travel is done during working hours. Iowa Code 91A.13.

## III. PLAINTIFFS HAVE MET THE FED. R. CIV. P. 23 STANDARDS FOR CLASS CERTIFICATION

### A. The Implicit Requirements of Fed. R. Civ. P. 23 are Met Because the Class Representatives Have Standing and are Members of the Precise, Objective, and Ascertainable Classes

Plaintiff's facts support class certification pursuant to Fed. R. Civ. P. 23. The trial court has the sound discretion to determine whether to certify a class action. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); Keele v. Wexler, 149 F.3d 589, 592

(7th Cir. 1998); <u>Retired Chicago Police Ass'n v. City of Chicago</u>, 7 F.3d 584, 596 (7th Cir. 1993). Class certification under Rule 23 requires a two-step analysis. <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1017 (7th Cir. 1992); <u>Temme v. Bemis Co. Inc.</u>, 2009 U.S. Dist. LEXIS 49894, (E.D.Wis. 2009)[4]; <u>Bzdawka v. Milwaukee Cnty.</u>, 238 F.R.D. 469, 472 (E.D.Wis. 2006).

First, the class must satisfy the requirements of Rule 23(a), and second, the class must satisfy one of the three subdivisions of Rule 23(b). Fed. R. Civ. P. 23. This Court has also recognized two additional implicit requirements for Rule 23 class certification.  The named plaintiffs must make a showing of standing in order to be members of the proposed class, to represent it, and to have claims typical of the potential class members. <u>Rozema v. Marshfield Clinic</u>, 174 F.R.D. 425, 432 (W.D. Wis. 1997, Crabb, J.). To have standing to bring a class action, the named plaintiffs must have "suffered an 'injury in fact' which is fairly traceable to the challenged action of the defendant and 'likely'…to be 'redressed by a favorable decision.'" <u>Mello v. AppleIllinois, LLC</u>, 2011 U.S. Dist. LEXIS 110133, *12 (N.D. Ill. 2012). Second, the definition of the proposed class must be "precise, objective, and presently ascertainable." <u>Alliance to End Repression v. Rochford</u>, 565 F.2d 975, 977-79 (7th  Cir. 1977).

The Named Plaintiff and representative of the Wisconsin Field Crew Class, Steven Berndt, has standing in this matter. Berndt has worked for Cleary since May 23, 2011. (Berndt Dec., ¶ 2). As a field crew member, Berndt was required to attend meetings and perform work at the branch office prior to going to the job site.

---

[4] All unpublished decisions are attached as Ex. 26 to Parsons Dec.

(Id. at ¶¶ 5-10). Because Berndt was subject to the common policies and practices at issue in this case, he is well within the class definition and has standing to sue on behalf of the Wisconsin Field Crew Class.

Named Plaintiff and representative of the Iowa Field Crew Class, Ryan Steere, has standing as he has worked for Cleary since June 28, 2010. (Steere Dec., dkt. # 274 ¶ 2). Steere was required to report to the Cleary branch office daily to attend mandatory meetings, perform work, and travel to and from the job site, all without compensation. (Id. at ¶¶ 5-12). As he was subject to the common practices at issue, Steere has standing to sue on behalf of the Iowa Field Crew Class.

Named Plaintiff and representative of the Minnesota Field Crew Class, Raymond Peterson, has standing to sue on behalf of this class. Peterson was employed as a field crew employee and foreman in the Mankato, Minnesota Cleary branch from August 27, 2008 through October 5, 2011. (Peterson Dec., dkt. #257, ¶ 2). Peterson has standing as he was subject to the common policies and practices at issue in this case. He was not compensated for time spent attending mandatory meetings, performing work at his branch office in the morning and the evening, and traveling between the branch office and the job sites. (Id. at ¶¶ 5-12).

Finally, named Plaintiff and representative of the Illinois Field Crew Class, Mike Harmon, has standing to sue on behalf of this class. Harmon worked as a field crew employee in the Olney, Illinois branch from April 14, 2011 through August 4, 2011. (Harmon Dec., dkt. # 239, at ¶ 2). Harmon was subject to the common policies

45

and practices at issue in this case (Id. at ¶¶ 5-11), and therefore has standing to sue on behalf of the Illinois Field Crew Class.

Plaintiffs' proposed classes must be defined such that they create classes consisting of all individuals who, by virtue of defendant's policy, are likely to be subjected to the illegal conduct. Alliance to End Repression, 565 F.2d at 576. Plaintiffs seek to certify four Rule 23 classes, but each definition concerns the same elements:

> All persons who have been or are employed by Cleary Building Corp. as field crew employees, and who were not compensated for time spent working before arriving at the worksite and for time spent working after leaving the worksite during the period from two years prior to the filing of this complaint to the present.

(Plaintiffs' Third Amended Collective and Class Action Complaint, dkt. #172 at ¶¶ 14-18).

The individuals who are members of these classes will be ascertainable through simple, objective criteria: the employment of the putative class members, and whether they were subject to the illegal pay policy at issue in this case. The illegal pay policy challenged in this case was established by Cleary Vice President Todd Montgomery, and uniformly enforced by regional managers, meaning putative class members at every Cleary branch nationwide worked without compensation. (Stinski Dec. ¶ 9, "Todd Montgomery was explicit in his expectation that both foremen and crew members were to be present at the morning meetings, at the branch office;" Akers Dec. ¶ 9, "I instructed regional managers in regions 8-13 that all field personnel were required to report at the branch office to make sure that

46

Cleary vehicles were ready for the workday. I did so at the direction of Todd Montgomery;" Sapon Dec. ¶9, "[P]ursuant to Cleary policy, field crew employees and foremen were required to report to branch offices each morning and attend a morning production meeting…As the GMO, I verbally instructed both Regional Managers and Branch Managers who reported to me that these meetings were mandatory and that they were to advise their field crew accordingly.").

Regional managers instructed branch managers that crews were required to arrive at the branch each morning to perform work and attend meetings without compensation. (Steele Dec. ¶ 6, "As a Regional Manager, I instructed Region 8 branch managers to hold daily, mandatory morning crew meetings wherein all of the branch field employees were required to attend…I instructed branch managers in this manner pursuant to Cleary policy and conversations I had with Cleary Vice President, Todd Montgomery;" Hodges Dec. ¶ 7; Thompson Dec. ¶¶ 6, 14). Branch managers then enforced Montgomery's policy by requiring field crew employees to report to the branch office, attend meetings, and work. (Irvin Dec. ¶ 5; Brah Dec. ¶¶ 5-6, "As a branch manager, I held daily, mandatory morning crew meetings wherein all the Slinger branch field employees were required to attend. I held these meetings and required attendance by the entire Slinger branch field employee crew pursuant to Cleary policy and instructions from my supervisors;" Baumgardner Dec. ¶ 5; W. Cleveland Dec. ¶ 5). Crew members from ten branches in Wisconsin, six branches in Iowa, two branches in Minnesota, four branches in Illinois, and thirty-five additional branches nationwide have confirmed that this is Cleary policy.

47

Parsons Dec., Ex. 18, Declarations Received.  Thus, the identity of the class members is easily ascertainable.

These are the factors implicitly required by Rule 23. The threshold requirements of Rule 23 are met because the Named Plaintiffs have standing, and their proposed classes are objective, precise, and ascertainable.

### B.  Plaintiffs Have Satisfied the Fed. R. Civ. P. 23(a) Requirements

The Fed. R. Civ. P. 23(a) requirements have been met in this case. Under Rule 23(a), class certification is appropriate when: (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the classes, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Putative class members have been subject to a common, illegal pay policy, and assert a common claim which meets the requirements of 23(a).

### 1.     The Class Members Are So Numerous That Joinder Is Impossible

Class certification is appropriate when, as in this case, the number of members in the proposed class is so large as to make joinder "impracticable." Fed. R. Civ. P. 23(a)(1). To be impracticable, joinder need not be impossible but only difficult or inconvenient. Great Neck Capital Appreciation Investment Partnership, L.P. v. Pricewaterhouse Cooper, L.L.P., 212 F.R.D. 400, 406 (E.D. Wis. 2002) (citing Adver. Specialty Nat'l Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956)). The Seventh Circuit has allowed that a group of forty is sufficiently large that joinder is

considered impractical. <u>Swanson v. Am. Consumer Indus., Inc.</u>, 415 F.2d 1326, 1333 n. 9 (7th Cir. 1969); <u>Clark v. Ford Motor Co.</u>, 220 F.R.D. 568, 578 (E.D. Wis. 2004).

Cleary currently employs approximately three hundred eighty foremen and non-foreman field crew members. (Bullock Depo., dkt. # 32, at 127:20-128:9). Within the applicable statutory periods in each state, there are 164 putative class members in Iowa, 237 in Illinois, 115 in Minnesota, and 282 in Wisconsin. (Parsons Dec., ¶ 9).

### 2.    Questions of Law and Fact Are Common to the Class

Second, Rule 23(a) requires a finding that there are questions of fact or law which are common to the class. Fed. R. Civ. P. 23(a)(2). This requires plaintiffs to show that they have all suffered the same injury, a "common contention" such that resolving the common issue will resolve all of the included claims in a single stroke. <u>Wal-Mart</u>, 131 S. Ct. at 2551 ("What matters to class certification . . . is not the raising of common 'questions'…but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (internal citations omitted)); <u>Williams-Green v. J. Alexander's Rests., Inc.</u>, 277 F.R.D. 374 (N.D. Ill. 2011) ("[Plaintiff] has demonstrated that her claims….arise from a common nucleus of fact based upon standardized conduct and, therefore, has satisfied the commonality requirement of Rule 23(a)(2).").

The claims asserted by Berndt, Steere, Peterson, Harmon, and the other putative class members have several common issues of law. Common issues of law include, but are not limited to:

- Whether Cleary violated Wis. Stat. § 103.03 and Wis. Adm. Code § DWD 274.03; Ill. Stat. 820 § 105/4a; and

49

> Minn. Stat. § 177.25 by failing to pay overtime
> compensation to the Named Plaintiffs and members of
> the putative classes for time spent performing work;
>
> -   Whether Cleary violated Wis. Stat. § 109.03; Illinois
>     Statutes § 115/3; Ill. Adm. Code. 56:I:b:210.110; Minn.
>     Stat. §181.101; Minn. Adm. Code § 5200.0120(1); Iowa
>     Stat. § 875-215.1; Iowa Adm. Code § 215.3(13) by
>     failing to pay wages to the Named Plaintiffs and
>     members of the putative classes for time spent
>     performing work.

Common issues of fact include:

> -   Whether Cleary maintained a policy of requiring field
>     crew employees to perform uncompensated work.

To satisfy commonality, it is enough that plaintiffs present just one common

claim. Wal-Mart, 131 S. Ct. at 2556. The question is whether the plaintiff's *theory*

can be proven on a classwide basis. Id, at 2555. Whether a company-wide policy

resulted in a failure to compensate workers and comply with the laws of Wisconsin,

Minnesota, Illinois, and Iowa presents a question common to the class, which can be

most efficiently answered on a class-wide basis. See McReynolds v. Merrill Lynch,

Pierce, Fenner & Smith, Inc., 672 F.3d 482, 490 (7th Cir. 2012) (cert. denied 2012

U.S. LEXIS 6143 (Oc.t 1, 2012)).

Plaintiffs have shown commonality because the members of the proposed

class were all subject to the same illegal pay policy created by Cleary's management

and implemented company-wide through its upper, middle and lower management.

This illegal pay policy commonly violates the laws of Wisconsin, Minnesota, Illinois

and Iowa which require compensation for all hours when employees are suffered or

50

permitted to work. Cleary's liability for these claims can be resolved by the finder of fact answering whether such a policy was in place and whether it was followed by Cleary employees. The Plaintiff has presented substantial evidence of both of these. As such, class certification is appropriate.

### a. Commonality Exists Because the Plaintiffs Have Demonstrated That Cleary Maintained an Illegal Pay Policy Which Was Uniformly Followed At Branches In Wisconsin, Iowa, Illinois, and Minnesota

Cleary systematically implemented a pay policy which required its field crew employees to perform uncompensated work. The existence and legality of this policy constitute a legal and factual question common to the entire class.

The Plaintiff has presented with this Motion declarations of two GMOs and an assistant GMO working directly beneath Todd Montgomery, Cleary's Vice President of Operations. Each of these individuals has testified that the directive to have crew members attend uncompensated morning meetings and to perform uncompensated work at the branch office came directly from Todd Montgomery. (Sapon Dec., dkt. # 192, at ¶ 9 "Todd Montgomery explicitly directed me to direct regional managers and branch managers not to pay field crew employees for mandatory work:" Stinski Dec., dkt. # 193, at ¶ 9; Akers Dec., dkt. # 194, at ¶¶ 9-10). Montgomery's policy not only required employees to report to the office to attend meetings, but to perform work to ensure that the Cleary trucks were prepared for the day's work. (e.g. Akers Dec., dkt. # 194, at ¶¶ 9-10, "As the Assistant GMO, I instructed regional managers in regions 9-13 that all field personnel were required to report to the branch office to make sure that Cleary

51

vehicles were ready for the workday…Todd Montgomery informed me that this work was to be performed by the field crew employees each morning.").

Beyond this, those regional and branch managers who interacted directly with these GMOs and with Todd Montgomery have verified that they were consistently told crew members must arrive in the morning to attend meetings and perform work. (Steele Depo., dkt. # 86, at 64:22-25 – 65:1-8, "Why did I instruct the branch managers to hold daily, mandatory morning crew meetings wherein all of the branch field employees were required to attend?....Todd Montgomery directed me to do this;" Hodges Depo., dkt. #176 at 101:16-23).

Branch managers in states with a proposed Rule 23 class were told by GMOs and regional managers that they were to require field crew employees to report to the branch offices to attend meetings and complete work, and state that they enforced these policies. (Brah Depo., dkt. #177 at 56:19-20 (Slinger, WI), "But as Todd Montgomery directed, the guys [non-foreman field crew employees] were always directed into the office;" Brah Dec., dkt. #33, at ¶ 9, "Field crew employees were never paid for the time spent loading crew trucks at the Slinger branch or performing other work activities at the Slinger branch;" W. Cleveland Dec., dkt. # 198, at ¶¶ 4-5 (Galesburg, IL), "I received an email from Todd Montgomery that was sent to all branch managers that explicitly stated that branch managers operating branch offices below a certain level were required to meet with their foremen and crew members on a daily basis;" Irvin Dec., dkt. # 35, at ¶¶ 5-6 (Cokato, MN), "I was explicitly advised by the Cleary Vice President, Todd Montgomery, that these

meetings were mandatory for all field employees and that Cleary policy required me to have these meetings with the entire crew on a daily basis."). Branch managers, pursuant to this policy, also required employees to perform work after these mandatory meetings.

Finally, eighty crew members from seventeen states, including thirteen from Iowa, twenty-four from Wisconsin, six from Illinois, and one from Minnesota, have provided declaration and deposition testimony confirming that the pay practices described by these GMOs, regional managers, and branch managers were followed at their branch location. (Parsons Dec., Ex. 24, Declarations Received; see, e.g., Berndt Dec., dkt. #41; see also Dziedzic Depo. at 49:7-8, "It was well known that we'd have to report to the branch office every morning;" Giacalone Depo. at 67:22-25, "There were informal meetings every day…we would talk about the jobs, where we were at, who was going on what crews;" see also supra Factual Background I.C).

Requiring Cleary field crew employees to report to the branch office to attend meetings and perform work without compensation is a violation of Wisconsin, Illinois, Minnesota, and Iowa law. Wis. Stat. § 109.03; 820 ILCS 115/3; Minn. Stat. § 181.101; Iowa Stat. 91A.3. As this was a common Cleary policy, whether Cleary violated the laws of these states is a question common to all putative class members.

It was also the policy of Cleary to require field crew employees to travel to the job sites in the Cleary vehicle, unless employees received special permission to drive their own vehicles. (Sapon Dec., dkt. # 192, at ¶ 8, "As the [General Manager of

Operations], I verbally instructed both Regional and Branch Managers who reported to me that traveling in the Cleary vehicle was mandatory and that they were to advise their field crew accordingly;" Wojtanek Depo., dkt. # 189, at 100:16-19, "From my understanding they weren't supposed to [drive their own vehicles to the job site], but if they needed to leave early or something, had something else going on in which they weren't going to be working a full day, they did."). However, it was Cleary policy not to compensate field crew employees for the time spent traveling between the branch office and the job site unless they were driving the vehicle. (Parsons Dec., Ex. 2, at FEH-10). The other individuals in the vehicle are not compensated for this time. (Bullock Depo., dkt. # 32, at 200:11-13).

Failing to compensate field crew employees for travel between the branch office, where they were required to arrive and perform work, and the job site violates Wisconsin, Illinois, Iowa, and Minnesota law. As field crew employees were traveling between locations where they were required to perform work, this drive time was all in a day's work and should be paid. Wis. Admin. Code DWD § 272.12(2)(g)(5) ("travel from the designated place to the workplace is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice"); 56 Ill. Adm. Code I:b:210.110; Minn. Adm. Code § 5200.0120(1); Iowa Code 91A.13. Plaintiff contends that this time is compensable based on the common Cleary policies requiring employees to arrive at the branch offices and perform work, and then travel to the job site to perform more work, without compensating employees for time spent in transit. Whether this policy constitutes a violation of

the aforementioned Wisconsin, Illinois, Minnesota, and Iowa state law is a question common to all members of the class, and one which can be resolved most efficiently through a single adjudication.

Cleary's policies also required field crew employees to return to the branch office at the end of the work day and unload trucks, put away trailers, or gather materials for the next work day. According to the Administrative Employee Handbook, "All production vehicles are to be parked at the office upon completion of work day." (Parsons Dec., Ex. 15; see also Bullock Depo., dkt. # 32, at 193:3-194:11; Parsons Dec., Ex. 16, Branch Manager Assessment, Bates 4567-68). As a result, field crew employees were required to unload materials and tools at the branch office at the end of the work day. (Sitzmann Depo., dkt. # 188, at 90:12-20, "It was pretty frequent. Every job we had some materials, extra materials or we didn't have enough, got to load the truck, got to clean the truck out."). However, pursuant to a directive from Todd Montgomery, field crew employees were not to be compensated for time spent performing work at the end of the day. (Sapon Dec., dkt. # 192, at ¶ 9).

As with travel time from the branch office to the job site, the return trip is compensable due to the requirement that employees be compensated for all labor performed during a continuous work day. Wis. Admin. Code DWD § 272.12(2)(g)(5); 56 Ill. Adm. Code I:b:210.110; Minn. Adm. Code § 5200.0120(1); Iowa Code 91A.13.

The corporate directives issued by Todd Montgomery from the Cleary corporate office flowed from corporate managers to regional managers to field crew

employees. This policy required employees to perform work daily at both the branch office and at the job site, but its pay practice is to only compensate for the time spent physically at the job site, to the exclusion of other work performed throughout the day. The laws of Wisconsin, Illinois, Iowa, and Minnesota make clear that employers are not permitted to pick and choose which work is compensable. Cleary's common, nationally enforced policy requires employees to work without pay at the branch offices at the start of the work day, travel without compensation to the job site, and then return without compensation to the branch office and perform more unpaid work. Whether this amounts to a violation of Wisconsin, Illinois, Minnesota, and Iowa laws is a common question, with a common answer. As such, it is best answered on a class-wide basis. See McReynolds, 672 F.3d at 490-91 (determining that whether the common corporate policy established by Merrill Lynch and enforced by local managers had a disparate impact on black employees is a question common to the class, and most efficiently answered on a class-wide basis).

These facts give rise to a common question, the resolution of which will determine Cleary's liability on a class wide basis: did Cleary maintain a pay policy which required the performance of uncompensated work by crew members?

### b. Variations in plaintiff damages do not defeat commonality.

The plaintiff's burden in showing commonality is to identify whether there are common questions which, if answered, will determine the outcome of the litigation. But this does not mean plaintiffs are required to show that each putative class member suffered the exact same injury, or that they are seeking the same

damages. Determining whether plaintiffs have a question which will have a "common answer" is not defeated by plaintiffs who may have differing damages. Nehmelman v. Penn Nat'l Gaming, Inc., 822 F. Supp. 2d 745, 755 (N.D. Ill. 2011).

Here, while employees may have worked at different branch offices or under different foremen or branch managers, all were subject to Cleary's common policies of requiring employees to perform uncompensated work at branch offices and not to compensate for travel time. Whether or not this is a violation of the wage and hour laws of each state is a question with a common answer, and this answer will determine the outcome for all plaintiffs.

Unlike Wal-Mart, in which plaintiffs alleged that discretion of local supervisors amounted to a policy of discrimination, the putative class members of the instant case allege that Cleary maintained a company-wide policy of not compensating for work performed at branch offices or the travel time included as part of a continuous work day. Plaintiffs are not alleging the lack of a policy, but point to a policy created at the highest levels at Cleary and implemented at every level thereunder. The questions for determining liability are common, and that is the question before the court in considering Rule 23(a)(2). Franks v. MKM Oil, Inc. 2012 U.S. Dist. LEXIS 128205, at 15 (N.D. Ill. 2012) ("Although the specific amount of damages would require individual calculations, the common question of whether the conversion violated the employee's…rights predominates."). To satisfy commonality, Plaintiffs must show a common question that would be addressed by

class action litigation, the answer to which will determine liability regarding

numerous employees. Id. at 14.

Plaintiffs seek to maintain multiple classes, depending upon the states where

putative class members were employed. Each of these classes presents a common

question, subject to common proof, which will establish Cleary's liability: did Cleary

maintain an illegal pay policy which required field crew employees to perform

uncompensated work? All members suffered a class-wide injury of not being

compensated for work performed. The Plaintiff and putative class members suffered

from Cleary's common unlawful policy. Each class satisfies the commonality

requirement of Rule 23(a)(2).

### 3.  The Claims of the Representative Parties Are Typical of the Claims of the Class

The claims of the named plaintiffs are typical of the putative classes as they

were subjected to Cleary's policy of requiring employees to perform uncompensated

work and attend meetings at the branch office each day.

Typicality requires the court to examine whether the named representative's

claims have the same "essential characteristics of the class at large" and "arises

from the same event or practice or course of conduct that gives rise to the claims of

the other class members and his or her claims are based on the same legal theory."

Blarek v. Encore Receivable Management, Inc., 244 F.R.D. 525, 528 (E.D. Wis.

2007) (citing De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.

1983)). The "[t]ypicality requirement may be satisfied even if there are factual

distinctions between claims of the named plaintiffs and those of other class

58

members. Thus, similarity of legal theory may control even in the face of differences of fact." Id., see also Curry v. Kraft Foods Global, 2011 U.S. Dist. LEXIS 102510 (stating, "[i]f the named Plaintiffs and the potential class members are united by a common legal theory…factual differences among them do not disrupt a finding of typicality.").

Typicality should be determined with reference to the defendant's actions, not with respect to particularized defenses against certain class members. Wagner v. NutraSweet Co., 95 F.3d 527, 534 (7th Cir. 1996). To meet the requirement of typicality, Named Plaintiffs must show that claims share essential characteristics, but do not need to show that their claims are identical.

Named Plaintiffs' claims arise from Cleary's policies of requiring employees to arrive at Cleary's branch offices to attend meetings and perform work at the start of their shifts and travel between the branch office and job site without compensation. The common question, for Berndt, Steere, Peterson, Harmon, and members of all the putative classes, is whether or not this policy violates Wisconsin, Illinois, Minnesota, and Iowa wage law. All four named Plaintiffs worked for Cleary as field crew members, and were required to perform work for Cleary and were not compensated in accordance with state wage law. (Berndt. Dec., dkt. # 41, at ¶¶ 5-10; Steere Dec., dkt. # 274, at ¶¶ 5-12; Peterson Dec., dkt. # 257, at ¶¶ 5-12; Harmon Dec., dkt. # 239, at ¶¶ 5-11).

In addition, the Named Plaintiff worked in the Eastern District, at one time supervised by General Managers of Operations Greg Sapon and Aaron Stinski.

(Sapon Dec., dkt. # 192, at ¶ 3, "I was responsible for the operations of…every branch office in Wisconsin, Illinois, Indiana, Ohio, Kentucky, Minnesota, Iowa, Missouri and Pennsylvania;" Stinski Dec., dkt. # 193, at ¶ 5).). At the direction of Vice President Todd Montgomery, Sapon instructed regional and branch managers in Wisconsin, Illinois, Minnesota, and Iowa that daily morning production meetings were mandatory, as was performing work in the mornings to prepare the vehicles for work. (Sapon Dec., dkt. # 192, at ¶¶ 5-7). Similarly, Stinski communicated to Regional Managers that field crew members were required to report to the field office in the morning, pursuant to Cleary's policy and Todd Montgomery's requirement. (Stinski Dec., dkt. # 193, at ¶ 9). Stinski also visited all the branch offices under his supervision on a monthly basis, and observed foremen and field crew employees attending morning production meetings at all branch offices. (Id. at ¶ 19). Sapon and Stinski both enforced these common policies in the regions where named plaintiffs worked, demonstrating that they were subject to the same illegal pay policies as the other putative class members.

The Named Plaintiffs, like all members of the putative classes they seek to represent, were subject to Cleary's illegal pay policy of requiring the performance of uncompensated work. By declaration or deposition, each Named Plaintiff has provided testimony confirming that they suffered the same injury as the putative class members, unpaid wages and overtime wages. As the Named Plaintiffs were subject to and suffered damages under Cleary's common pay policy, their claims are typical of those putative class members they seek to represent.

### 4. The Class Representatives Will Fairly and Adequately Protect the Interests of the Class

The final requirement of Rule 23(a), adequacy, is satisfied if (1) the representative Plaintiffs do not have interests antagonistic to those of the other class members, and (2) if counsel is qualified to conduct the litigation. Uhl v. Thoroughbred Tech. and Telecomm., 309 F.3d 978 (7th Cir. 2002). In order to be an "adequate" representative, Named Plaintiffs need not have extensive knowledge of the facts of the case. Gunnells v. Healthplan Servs., Inc., 348 F.3d 417 (4th Cir. 2003).

Berndt, Steere, Peterson, and Harmon are adequate representatives of the classes because they have suffered the same injuries as the putative class members. Berndt, Steere, Peterson, and Harmon, as field crew employees of Cleary, were subject to the requirement that field crew members attend mandatory daily meetings and perform work at the branch offices prior to traveling to the job sites, without compensation. (Berndt Dec., dkt. # 41, at ¶ 11; Steere Dec., dkt. # 274, at ¶ 11; Peterson Dec., dkt. # 257, at ¶ 12; Harmon Dec., dkt. # 239, at ¶11). Thus, Berndt, Steere, Peterson, and Harmon, like all putative class members, were denied compensation and overtime compensation for hours spent doing work for the benefit of Cleary as a result of Cleary's common policies. There is no divergence of interests between the proposed class representatives and the interests of the class as a whole as they like the class members seek compensation for the unpaid time as well as any additional damages awarded by the Court. The Named Plaintiffs are prepared to prosecute this suit on behalf of the class.

Further, Plaintiffs' counsel should be appointed class counsel pursuant to Rule 23(g). Plaintiffs' counsel is experienced in complex wage and hour litigation and has served as class counsel in numerous actions before this Court. (Parsons Dec., at ¶¶ 3-6). Each of the four attorneys representing the class has the depth and breadth of experience necessary to adequately represent the class in this matter. Id. The class representatives are fully qualified and committed to full prosecution of this case on behalf of the class and Plaintiffs' counsel will fairly and adequately represent the class.

## IV.   THE PLAINTIFFS HAVE SATISFIED THE FED. R. CIV. P. 23(b)(3) REQUIREMENTS

In addition to satisfying all four requirements of Rule 23(a), the proposed class must satisfy at least one of the three requirements listed in Rule 23(b). Wal-Mart, 131 S. Ct. at 2548. When plaintiffs seek monetary damages rather than solely injunctive relief, the class certification inquiry focuses on Fed. R. Civ. P. 23(b)(3). Subsection (b)(3) requires that plaintiffs show "questions of law or fact common to members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The Supreme Court of the United States has held that a class should be certified when "a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. 591, 615, 117 S. Ct. 2231 (1997) (citing Fed. R. Civ. P. 23

Advisory Committee Notes); <u>see</u> <u>also</u> <u>Mejdrech v. Met-Coil Systems Corp.</u>, 319 F.3d

910, 911 (7th Cir.2003) ("[C]lass action treatment is appropriate and permitted by

Rule 23 when the judicial economy from consolidation of separate claims outweighs

any concern with possible inaccuracies from their being lumped together in a single

proceeding for decision by a single judge or jury.")

### A.  Questions of Law or Fact Common to the Entire Class Predominate Over Individual Issues

To meet the predominance requirement of Fed. R. Civ. P. 23(b)(3), the

common question(s) need not be dispositive of the entire action. 7AA Wright, Miller

& Kane, Federal Practice and Procedure, § 1778 (3d ed. 2008). A "single common

issue may be the overriding one in the litigation, despite the fact that the suit also

entails numerous remaining individual questions." <u>Blihovde v. St. Croix County,</u>

<u>Wis.</u>, 219 F.R.D. 607 (W.D. Wis. 2003) (<u>citing</u> Newburg & Conte, Newberg on Class

Actions § 4.25, at 4-84 (3d ed.1992)). The basic question is "whether proposed

classes are sufficiently cohesive to warrant adjudication by representation."

<u>Amchem</u>, 521 U.S. at 623.

#### 1.  The Question of Whether Cleary Maintained a Uniform Illegal Pay Practice Predominates Over Individual Issues

Cleary had a common policy of not compensating employees for work they

were required to perform at the branch offices prior to and following work done at

the job sites. (See, e.g., Sapon Dec., dkt. # 192, at ¶ 9 (Eastern District GMO), "Todd

63

Montgomery explicitly directed me to direct regional managers and branch managers not to pay field crew employees for the following mandatory work: mandatory production meetings…work performed at the branch office…travel time;" Thompson Dec., dkt. # 196, at ¶ 15 (Regional Manager, District 6), "In accordance with Cleary policy, the foreman never recorded time spent at the daily mandatory meetings, loading trailers, loading crew trucks, restocking Cleary crew trucks with supplies, and hitching trailers or time spent traveling to and from the branch offices and the job sites;" Berndt Dec., dkt. # 41, at ¶ 11 (Slinger Field Crew Employee), "I have not been provided compensation for the time I am required to work each morning at the branch office prior to arriving at the job site, the time I am required to work each day at te branch office following my return from the job site, or the time I spend traveling between the job site and Cleary.").

To show predominance, plaintiff must demonstrate that the element at issue is capable of proof which is common to the class rather than to individual members. Messner, 669 F.3d at 814-18. Plaintiffs must show whether there is a common method of proof for determining whether Cleary is liable as to the defined class. Driver v. Appleillinois, LLC, 2012 U.S. Dist. LEXIS 27659 (N.D. Ill. 2012). Plaintiffs do not have to show common damages to demonstrate predominance (Messner, 669 F.3d at 819), but must show that damages are capable of measurement on a classwide basis. Comcast v. Behrend, 133 S.Ct. 1426, 1433 (2013).

Issues of law and fact in the present case are common to the entire class, and these issues predominate over any individualized inquiries. Named Plaintiffs, on

behalf of the putative classes, challenge Cleary's policy of requiring field crew employees and foremen to perform work without compensation, and its failure to compensate for travel time that is part of a continuous work day. The common question as to the validity of these policies under Wisconsin, Illinois, Minnesota, and Iowa law, as applied to each of the classes, predominates over any potential individual issues. "When a class of employees [is] attacking the validity of an employer policy or practice, the validity of that policy predominates over individual issues and class certification is appropriate." Kasten v. Saint-Gobain Performance Plastics Corp., 556 F. Supp.2d 941, 961 (W.D. Wis. 2008) (citing Blihovde v. St. Croix County, Wis., 219 F.R.D. 607, 620 (W.D. Wis. 2003)).

In one such case, Kasten v. Saint-Gobain Perf. Plastics Corp., the court examined the predominance standard as it applied to a class of manufacturing employees claiming unpaid wages under Wisconsin law. 556 F. Supp.2d 941(W.D. Wis. 2008, Crabb, J.). In Kasten, the plaintiffs challenged the validity of a policy whereby the Kronos time system automatically deducted half an hour from each employee's daily wages for a meal period, despite the fact that these employee were required to don and doff protective clothing during these unpaid meal periods. (Id. at 949-950). The central legal question concerning the meal period class in Kasten was whether the donning and doffing of clothing during meal periods was "work" within the meaning of Wis. Admin. Code § 272.12(1). (Id. at 952). The Court held that the legal issue of whether the donning and doffing activities were "work" predominated over any potential individual variances in time spent donning and

doffing. (Id. at 961). Quoting Blihovde, the Court held that where the validity of a policy is in question, the validity of that policy predominates over individual issues. (Id. at 961 (citing Blihovde, 219 F.R.D. at 620)).

The Kasten decision regarding predominance is consistent with other Seventh Circuit rulings, which have found that common issues related to the legality of the policy predominate over individual inquiries. See e.g. Messner, 669 F.3d at 815 ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question," citing Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)); Driver, 2012 U.S. Dist. LEXIS 27659 at 9-10 (responding to defendant's argument that attempting to determine whether dual job law pertaining to tipped occupations would require "detailed examinations of evidence unique to each class member," the Court observed that "[a]lthough variations among class members likely did exist…the class was nevertheless held together by the ultimate question of "whether an unlawful overtime policy prevented employees from collecting lawfully earned overtime compensation."); Curry, 2011 U.S. Dist. LEXIS 102510 (stating that in a case regarding compensation for time spent donning and doffing, "[a] legal determination as to whether Plaintiffs are entitled to unpaid compensation for this time will be a driving force in the lawsuit. If [this time] is compensable, then a fact determination

equally affecting all the class members will be whether Kraft has paid the employees the amount they are owed").

In this case, Wisconsin, Illinois, Minnesota, and Iowa law require employees be compensated for all working hours, and to be paid overtime. Wis. Stats. § 103.03, Wis. Adm. Code § DWD 274.03, Wis. Stats. § 109.03, Ill. Stats. 820 § 105/4a, Minn. Stat. § 177.24, and Iowa Stat. § 91D. An employee must be compensated for time spent performing work which is integral and indispensable to the principal activities for which they are compensated. IBP, Inc., 546 U.S. at 30.[5]

Named Plaintiffs allege Cleary's common policy of not compensating employees for work performed at branch offices and transportation between branch offices and job sites violates Wisconsin, Illinois, Minnesota, and Iowa law for several reasons. Attendance at these meetings was not voluntary, as employees were told by branch managers and foremen that they were required to arrive at a particular time each morning. (Bullock Depo., dkt. # 32, at 135:18-23; Sapon Dec. ¶ 6, dkt. # 192, at "Field crew employees were required to report to branch offices each morning and attend a morning production meeting;" Steele Depo., dkt. # 86, at 67:2-22; see also supra Factual Background I.a – I.c). As such, this time should be compensated. See 29 C.F.R. 785.38 ("Where an employee is required to report at a meeting place to receive instructions or perform other work there, or to pick up and carry tools, the travel from the designated place to the work place is part of the

---

[5] See also Minn. Adm. Code § 5300.0120(1); Iowa Adm. Code § 215.3(13); Wis. Adm. Code DWD § 272.12(1)(2); Ill. Adm. Code 56:I:b:210.110.

day's work"); see also Minn. Adm. Code. § 5300.0120(1); Iowa Adm. Code §

215.3(13); Wis. Adm. Code DWD § 272.12(1)(2); Ill. Adm. Code 56:I:b:210.110.

Additionally, work performed was integral to field crew members' principal

activity of constructing buildings, as they required the tools and materials collected

and loaded in the mornings to do so. (Sapon Dec., dkt. # 192, at ¶ 7). As this time

was spent in "principal activities", these constitute "hours worked" for the purposes

of FLSA and analogous state law, and must be compensated as such. Dole v. Enduro

Plumbing Inc., 117 Lab. Cas. (CCH) P35, 11-13. The same is true for the time spent

in transit between the branch offices and job sites. Under 29 C.F.R. § 785.41, an

employee who drives a work vehicle, or an employee who is required to ride therein,

is working while riding. 29 C.F.R. 785.41; see also Dole, 117 Lab. Cas. at 15 ("travel

time itself is compensable when work is performed while traveling, such as in this

case where the construction workers…are responsible for picking up and

transporting a truck to the jobsite…for the purpose of transporting other

employee(s), tools or materials"). This also includes time spent on a return trip

where the employer requires that the vehicle be returned to a particular location.

Burton v. Hillsborough County, 181 Fed. Appx. 829, 835 (11th Cir. 2006). Unlike

the employees in the Seventh Circuit case Baxter v. GTE North, Cleary employees

are not permitted to drive the Cleary-owned vehicles home. 110 F.3d 28, 30-31 (7th

Cir. 1997). All activities which are an "integral and indispensable part of the

principal activity" are compensable. Steiner, 350 U.S. at 252-53; IBP, Inc., 546 U.S.

at 37.

68

Whether Cleary's common policies of requiring field crew employees and foremen to perform work at the branch offices and travel in company-owned vehicles from the branch office to the job sites without compensation violate Wisconsin, Illinois, Minnesota, and Iowa law are questions which are established through generalized common proof. Because the answer to this question determines Cleary's liability for each class, the common questions predominate over individual issues. See Arreola v. Godinez, 546 F.3d 788, 801 (7th Cir. 2008) (need for individual damages determinations does not, by itself, preclude finding that class action is maintainable on predominance grounds).

Plaintiffs have demonstrated common proof regarding the factual basis of class members' claims. Upper-level managers state that they imposed a common policy of requiring field crew members to arrive at branch offices to attend meetings and perform work before riding in Cleary trucks to the job sites. (Sapon Dec., dkt. # 192, at ¶ 9; Akers Dec., dkt. # 194, at ¶ 9; Stinski Dec., dkt. # 193, at ¶ 10). Based on these instructions from regional managers, branch managers enforced these policies at local branch offices. (See, e.g., W. Cleveland Dec., dkt. # 198, at ¶ 5, "I received an email from Todd Montgomery that was sent to all branch managers that explicitly stated that branch managers operating branch offices below a certain level were required to meet with their foremen and crew members on a daily basis. I was never instructed by my supervisors to pay field employees for this time;" Baumgardner Dec., dkt. # 197, at ¶¶ 5-6 "I advised the Regional Manager that the entire field crew attended morning meetings and was never advised that this was

incorrect or against Cleary policy;" Irvin Dec., dkt. # 35, at ¶¶ 5-6; Brah Dec., dkt. # 33, at ¶¶ 5-6). As a result of this top-down enforcement, putative class members from a minimum of 53 branch offices report that they were required to arrive at Cleary branch offices at a particular time each morning to perform work. (See, e.g., Williams Dec., ¶ 8 (field crew employee in Delta, Colorado); Bigley Dec., ¶ 8 (Lincoln, Nebraska); Bouche Dec., ¶ 8 (Lake Geneva, Wisconsin); Brownrigg Dec., ¶ 8 (Heath, Ohio); Espinoza Dec., ¶ 8 (Humboldt, Iowa); Frasier Dec., ¶ 7 (Pittsfield, Illinois)).

It was Cleary policy not to compensate field crew members for this time. (Sapon Dec., dkt. # 192, at ¶ 9, "Todd Montgomery explicitly directed me to direct regional managers and branch managers not to pay field crew employees for…mandatory morning production meetings…work performed at the branch office…travel time between the branch office and the job site;" Stinski Dec., dkt. # 193, at ¶ 15, "Employees were not to be paid for time spent performing work away from the jobsite, including time spent at meetings and performing other work prior to arrival at the job site. I informed regional and branch managers to this effect based on these conversations with Todd Montgomery."). Branch managers enforced this policy by telling foremen not to record field crew employees' time until the field employees arrived at the job site, meaning time spent attending daily mandatory meetings and loading or unloading trucks was not compensated. (Brah Dec., dkt. # 33, at ¶ 8; Irvin Dec., dkt. # 35, at ¶ 8; W. Cleveland Dec., dkt. # 198, at ¶ 8; Baumgardner Dec., dkt. # 197, at ¶ 7). Foreman state that they were instructed not

to include this time as compensable when reporting hours worked, although crew employees were working during this time. (Clark Dec., dkt. # 212, at ¶ 11; Day Dec., dkt. # 216, at ¶ 8; Giacalone Dec., dkt. # 45, at ¶ 11).

Predominance is satisfied when a "common nucleus of operative facts and issues underlies the claims brought by the proposed class." Messner, 669 F.3d at 815 (citing In re Nassau County Strip Search Cases, 461 F.3d 219, 228 (2d Cir. 2006) (internal quotations omitted). The elements of the underlying cause of action inquire whether Cleary maintained a policy which required putative class members to perform work without compensation, in violation of state law. Plaintiffs have demonstrated a "common nucleus" of fact through the statements of upper and middle managers of Cleary, who have attested to this common policy, and through field crew employees, who state they were subject to this policy. This meets the requirement of Rule 23(b)(3) requirement that plaintiffs make a showing of common questions which may be answered through a showing of common evidence. Messner, 669 F.3d at 819. Plaintiffs' common question, whether Cleary violated Wisconsin, Illinois, Minnesota, and Iowa wage law through its policy of requiring work without compensation, may be answered through common evidence, and it predominates over any individual issues.

### 2. Comcast Corp. v. Behrend and Its Progeny Do Not Foreclose Class Certification in This Case

Comcast Corp. v. Behrend and its progeny do not foreclose class certification in this case. 133 S. Ct. 1426 (2013). In Comcast, the plaintiffs sued Comcast for violations of antitrust laws and sought to certify a class of plaintiffs who paid higher

71

cable rates as a result of monopolistic practices.  Id. at 1429-30.  The plaintiffs alleged four theories of antitrust liability to support their claim: (1) "clustering liability; (2) "overbuilder-deterrence liability;" (3) "benchmark liability;" and (4) "increased bargaining power liability."  See Id. at 1430-31.  The district court found that "overbuilder liability" was the only theory capable of classwide proof.  Id. at 1431. Yet, the district court accepted the plaintiffs' calculation of damages, which the expert calculated without itemizing how much damages could be attributed to each theory of liability.  Id. This was the mistake with which the Supreme Court took issue.

Comcast, therefore, stands for the common sense principle that, if a class is certified based on one theory of liability, then the damages calculation must be derived from that theory of liability. See id. at 1433-35.  This assertion is manifested by the Court's analysis. The Court noted that, despite the district court's decision that only one legally valid theory of liability existed, the expert's damages calculation "assumed the validity of all four theories of antitrust impact initially advanced by [the plaintiffs]." Id. at 1434. The Court went on to note that the expert "expressly admitted that the model calculated damages resulting from 'the alleged anticompetitive conduct as a whole' and did not attribute damages to any one particular theory of anticompetitive impact." Id. The Court, therefore, reversed the district court's decision because the expert failed to tie his damages model to the one and only theory of liability upon which the plaintiffs could have legally recovered.  Id. at 1434-35.

Comcast, therefore, does not stand for the proposition that, in all cases and under all circumstances, the necessity of individual damages calculations preclude a finding of predominance.  Such a ruling would effectively eviscerate Rule 23 as a valid device to achieve judicial economy in cases where many common questions of law and fact can be applied to an entire class of plaintiffs. The interplay of Rule 23 and individual damages calculations was not even contested or disputed in Comcast.  Id. at 1430.

Further, courts in every circuit prior to Comcast have uniformly held that the predominance requirement can be satisfied despite the need for individual damages calculations, and nothing in the Court's majority opinion purported to overrule this widely accepted notion. In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 28 (1st Cir. 2008) ("Predominance is not defeated by individual damages questions as long as liability is still subject to common proof."); Tardiff v. Knox County, 365 F.3d 1, 6-7 (1st Cir. 2004) ("[T]he need for individualized damage decisions does not ordinarily defeat predominance where there are still disputed common issues as to liability."); In re Visa Check MasterMoney Antitrust Litigation, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); Chiang v. Veneman, 385 F.3d 256, 273 (3d Cir. 2004) ("It has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."); Gunnells v. Healthplan Servs., Inc., 348 F.3d

417, 427-28 (4th Cir. 2003) ("Indeed, in actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred. When such individualized inquiries are necessary, if common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." (internal quotations and citations omitted)); Bertulli v. Independent Ass'n of Continental Pilots, 242 F.3d 290, 298 (5th Cir. 2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue."); Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007) ("[C]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." (internal citation omitted)); Arreola v. Godinez, 546 F.3d 788, 801 (7th Cir. 2008) ("[T]he need for individual damages determinations does not, in and of itself, require denial of his motion for certification."); Cf. Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996) (discussing typicality requirement, noting that "the fact that damage calculations might differ slightly [between plaintiffs] is a minor matter in comparison with these fundamental similarities," and therefore, class certification is not defeated); Midwestern Machinery v. Nw. Airlines, Inc., 211 F.R.D. 562, 571 (D. Minn. 2001) ("The mere existence of individual questions such as damages does not automatically preclude satisfaction of the predominance requirement."); Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th

Cir. 2010) (In this circuit . . . damage calculations alone cannot defeat certification. We have said that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment.'").DG v. Devaugn, 594 F.3d 1188, 1195 (10th Cir. 2010) ("Factual differences between class members' claims do not defeat certification where common questions of law exist."); Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."); McCarthy v. Kleindienst, 741 F.2d 1406, 1415 (D.C. Cir. 1984) ("Appellants argue . . . that the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification. We agree."); Chang v. U.S., 217 F.R.D. 262, 272 (D.D.C. 2003) ("[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification.").

This case involves a set of facts that demands class certification. Plaintiffs assert that Cleary maintained a common company-wide policy of not compensating its field crew employees for work time in meetings, work time loading and unloading vehicles, and travel to and from jobsites. Plaintiffs have hired an expert and have described the methodology they will use to determine damages based on the Plaintiffs' theory of liability, discussed below. Plaintiffs have submitted a declaration describing this methodology and fully intend to file the expert's report on September 16, 2013, the deadline to do so. (Declaration of Michael Childers

(Childers Dec.), dkt. # 290). As such, Plaintiffs' damages calculation will be subject to a common method, and <u>Comcast</u> is not at issue.

### 3. Plaintiffs Can Demonstrate Damages For Class Using A Common Methodology

Damages for all class members can be demonstrated using a common methodology. Expert Dr. Michael Childers will calculate a representative amount of time during which field crew members performed work without compensation by Cleary. This common methodology will show the amount of uncompensated work performed by each employee at the branch office prior to leaving for the job site, and after returning at the end of the day. <u>See</u> <u>Jordan v. IBP, Inc.</u>, 542 F. Supp. 2d 790 (M.D. Tenn. 2008) (class certification granted; plaintiff's expert used a common methodology to determine the amount of time spent performing integral work prior to principal activities).

Plaintiffs advance a single theory as to liability and damages: that the time spent performing work and attending meetings at the Cleary branch offices is compensable, as is travel time as part of a continuous work day. Wis. Stat. § 109.03; 820 ILCS 115/3; Minn. Stat. § 181.101; Iowa Stat. 91A.3; <u>see</u> <u>supra</u> Argument II.B.ii. Unlike the plaintiffs in <u>Comcast v. Behrend</u>, who asserted four possible theories as to how they were injured due to defendant's anti-trust action, plaintiffs in the instant case have but one theory, which may be proven by one common model. 133 S.Ct. 1426. Plaintiffs in the case at bar have a common methodology, in which Michael Childers will be able to calculate damages on a class wide basis, tied

to Plaintiffs' theory of liability: that work performed at Cleary branches and traveling to and from the job site is compensable work activity.

First, Plaintiffs can easily ascertain the uncompensated drive time hours for the Field Crew classes. These putative class members were required, per Cleary policy, to meet at the Cleary branch office each morning (Sapon Dec., dkt. # 192, at ¶ 8), and LCeary did not compensate them for their travel time. (Bullock Depo., dkt. # 32, at 200:11-13). Drivers are required to maintain accurate logbooks for the DOT showing the amount of time spent driving from the branch office to the job site. (Gonsalves Dec., dkt. # 195, at ¶ 5). By examining these logbooks, it will be clear how much time was spent traveling between the branch office and the job sites. Cleary keeps daily records of which crews are assigned to which jobs, and these records can be used to select DOT records to use to calculate damages for class members. (Parsons Dec., Ex. 25, Branch Manager Production Functions Manual, at PROD-5c). Damages for the field crew employees can be determined through a simple calculation using these logbooks.

Plaintiffs also can demonstrate that the uncompensated time spent attending meetings and performing work at the branch office is capable of proof at trial through evidence common to the class. See Comcast, 133 S.Ct. at 1430. Through a survey conducted by Dr. Childers, and his analysis of the same, Plaintiffs can determine the precise amount of time spent performing these uncompensated activities. (Childers Dec., dkt. # 290 at ¶¶8-9). Further, once the data set is compiled and analyzed, the Plaintiffs will be able to determine, within statistically

acceptable bounds, methods for identifying representative groups who may be subject to cross examination at trial.  (Id. at ¶ 8).

Courts have allowed the use of representative testimony to prove violations with respect to all employees. See, e.g., Reich v. Gateway Press, 13 F.3d 685, 701-02 (3d Cir. 1994). Reasonable approximations of hours worked are appropriate in such a situation. Urnikis-Negro v. Am. Family Prop. Servs., 616 F.3d 665, 669 fn. 2; Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 ("An employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.") Dr. Childers's methodology will provide a representative sample of how many hours field crew employees and foremen worked without compensation.

This methodology is sufficient for demonstrating damages on behalf of the class. First, it is consistent with Plaintiffs' theory of liability, as it is designed to identify the amount of time spent performing work and attending meetings at the branch offices without pay, which is the illegal policy challenged here. Comcast, 133 S.Ct. at 1433. The issue with the proposed model in Comcast was that it did not take into account any of plaintiff's proposed theories of liability; here, the only theory is that class members should have been paid for this time. Id. at 1434. All that is needed is a reliable way to determine how much time class members spent performing uncompensated work, which is provided by Dr. Childers's methodology.

78

This methodology is straightforward and sufficient to fairly calculate damages for the entire class. The unrepresented time can be reliably reconstructed by using a representative sample to infer the uncompensated hours for all class members.

The predominance requirement is met in this case for each of the putative classes because the Named Plaintiffs challenge the legality of Cleary's common policy of refusing to pay employees for work performed and travel time during a continuous work day. Whether Cleary's practice violates Wisconsin, Illinois, Minnesota, and Iowa law is the central issue to this case and is one that can be answered through common proof.

### B. A Class Action Is Superior to Other Methods Available for Fair and Efficient Adjudication

Rule 23(b)(3)'s dominant purpose is "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all." Amchem, 521 U.S. at 617. In evaluating this requirement, courts consider the following: (1) the interest of class members in controlling the prosecution of their own claims; (2) the existence of other pending litigation related to the same controversy; (3) the desirability of concentrating the claims in one forum; and (4) the difficulty of managing the class. Fed. R. Civ. P. 23(b)(3).

As demonstrated above, the central factual and legal questions in this case can, and should, be resolved for all members of the class in a single adjudication. The superiority requirement of Rule 23(b)(3) asks whether it makes sense to resolve

any non-common, non-predominant issues together with the common predominant issues in one class action. It makes sense to do so in this case because the resolution of any remaining questions, even if they involve individualized questions with respect to damages, are easily manageable and do not defeat the efficiencies gained by resolving the core common questions on a representative basis.

A class action is superior to alternative methods of adjudication because the alternative would involve hundreds of relatively small individual actions. "Class certification is a sensible and legally permissible alternative to… individual suits each of which would cost orders of magnitude more to litigate than claims would be worth to the Plaintiffs." Pella Corp. v. Saltzman, 606 F.3d 391, 393 (7th Cir. 2010)(internal citations omitted). Class actions are designed to "compensate victimized members of a group who are similarly situated….but also to deter violations of the law, especially when small individual claims are involved." Murray v. New Cingular Wireless Servs., 232 F.R.D. 295, 305 (N.D. Ill. 2005) (citing Gammon v. GC Servs. Ltd. P'ship, 162 F.R.D. 313, 321 (N.D. Ill. 1995)). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997).

Multiple individual actions would duplicate this proceeding and amount to a waste of resources for all parties and this Court. "Class certification is usually considered a superior method of adjudicating claims involving standardized

conduct, even if there are individual issues that exist among class members (for example, on issues such as damages)." <u>Armes v. Sogro, Inc.</u>, 2011 U.S. Dist. LEXIS 33241 *16 (E.D. Wis.). It would be absurd to adjudicate dozens of separate actions concurrently to resolve the same questions, which could be more efficiently resolved in the present case.

The four factors enumerated in Rule 23(b)(3) for analyzing whether a class action will be superior to individual actions also favor certification of all the issues in this action. The first factor considered is the interest of each member in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). In cases such as this, where an employer's wage and hour policy affects a large number of workers and the individual damages are relatively low, individual actions are highly unlikely to occur. Such actions are cost prohibitive because the litigation costs will far outweigh the potential individual recovery. Further, many of the workers may not be aware that they could be entitled to additional compensation. Finally, individual employees may choose not to bring individual actions out of fear of retaliation.

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B). Here, no putative class member has filed a rival action.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This forum is clearly appropriate as a significant portion of the alleged violations

occurred within this Court's jurisdiction, and the corporate headquarters of Cleary are located in Wisconsin. Plaintiffs contend that all putative class members were subject to a common policy originating in Cleary's corporate headquarters and requiring them to perform work without compensation. Concentrating litigation in the location of the corporate office will facilitate litigation of this claim. As Cleary operates eighty branches in twenty-four states, centralizing the action in the forum of the corporate decision-makers is the most convenient way to adjudicate this action. (Bullock Depo., dkt. # 32, at 63:3-5; 64:7-12).

The fourth factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). Denial of class certification for management reasons is disfavored and "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable should be the exception rather than the rule." In re Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124, 140 (2d Cir. 2001); see In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622, 628 (D. Wash. 1978). This is particularly true here. After liability has been determined, which can be done through proof common to the class, the only remaining issues relate to damages. With Plaintiffs' methodology for common calculation of damages, this class action would be manageable. Indeed, other courts have explicitly recognized that individual questions with respect to damages do not defeat class action treatment. Messner, 69 F.3d at 819, In re Visa Check, 280 F.3d at 139, Driver, 2012 U.S. Dist. LEXIS 27659 at *9, Curry v. Kraft Foods Global, Inc., 2011 U.S. Dist. LEXIS 102510 at *20 (N.D. Ill. 2011).

In addition, courts have routinely rejected arguments concerning the unmanageability of "individualized" defenses in the context of "off- the- clock" claims, citing the use of representative testimony. See, e.g., Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 540 (S.D. Tex. 2008).[6] In the instant case, however, the question regarding liability is simple. The only question to be answered is whether class members performed compensable work for which, due to Cleary's policies, they were not paid.

Furthermore, there are numerous management tools available to this Court that would enable it to adeptly deal with any management concerns with respect to damages. See In re Visa Check, 280 F.3d at 140 (e.g., bifurcating liability and damage trials with the same or different juries; appointing a magistrate judge or special master to preside over individual damages proceedings; decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; creating subclasses; or altering or amending the class); Robinson v. Metro- North Commuter R.R. Co., 267 F.3d 147, 168 (2d Cir.

---

[6] Courts have allowed the use of representative testimony in cases involving allegations of unpaid overtime. See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); Schultz v. Capital Intern. Sec., Inc. 466 F.3d 298, 310 (4th Cir.2006); Grochowski v. Phoenix Constr., 318 F.3d 80, 88 (2d Cir.2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages"); Reich v. Gateway Press, 13 F.3d 685, 701-02 (3d Cir.1994) ("Courts commonly allow representative employees to prove violations with respect to all employees."); Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 829 (5th Cir.1973) (allowing representative testimony in a case involving unpaid overtime); Thiebes v. Wal-Mart Stores, Inc., 2004 WL 1688544, at *1 (D.Or. July 26, 2004); National Electro-Coatings, Inc. v. Brock, No. C86-2188, 1988 WL 125784, at *8 (N.D.Ohio July 13, 1988) ("Courts have consistently allowed, or even required, a small number of employees to testify to establish a pattern of violations for a larger number of workers."); see also The Fair Labor Standards Act 1333 (Ellen C. Kearns et al., eds.1999) (noting that it is "well settled" that "not all affected employees must testify in order to prove violations or to recoup back wages. Rather, in most cases, employees and the Secretary may rely on representative testimony").

2001), quoting Edward F. Sherman, Class Actions and Duplicative Litigation, 62 IND. L.J. 507, 516 (1987) ("'[a] class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it in line. These include subclassing and trial of subclass issues separately, bifurcating liability and damages, ... [and] appointing a special master for difficult evidentiary matters'"). A class action is superior in this case because the main issues can be determined on a representative basis and individual issues are easily manageable.[7]

Finally, these putative classes are manageable. Cleary maintains clear records of its current and former employees. (Gonsalves Dec., dkt. # 195, at ¶¶ 4, 7; Akers Dec., dkt. # 194, at ¶¶ 4, 6). In addition, the compensation policies were common for all employees. (Sapon Dec., dkt. # 192, at ¶ 9; Stinski Dec., dkt. # 193, at ¶ 15).

## V.    THE PLAINTIFFS' PROPOSED FORM AND MANNER OF SERVICE OF NOTICE ARE APPROPRIATE

For any class certified under Fed. R. Civ. P. 23(b), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B).

The Plaintiffs propose that, should the court deem the instant action proper for class certification, Plaintiffs will send, by first class mail, the notices attached as

---

[7] The superiority requirement is not defeated by the existence of a conditional certification under Rule 216(b) of the FLSA which is inclusive of some of the same putative class members. In Ervin v. Os Restaurant Services, Inc., the Seventh Circuit stated explicitly that "[n]othing we find suggests that the FLSA is not amenable to state-law claims for related relief in the same federal proceeding." 632 F.3d 971-, 2011 WL 135708 (7th Cir. 2011).

Exhibits 18, 19, 20, and 21 to the affidavit of Attorney Parsons filed in support of this motion. The Plaintiffs have fashioned these notices on notices approved in similar cases, and believe their substance is consistent with the requirements of Fed. R. Civ. P. 23(c)(2)(B). Said notices identify the nature of this action, the definition of the class certified, the class claims and defenses, that class members may enter an appearance through an attorney, that the Court will exclude from the class any member who requests exclusion, the time and manner for requesting exclusion; and the binding effect of a class judgment on members under Rule 23(c)(3). The Plaintiffs will send these notices to all members of the classes who can be identified. The notice is detailed and accurate, and Plaintiffs therefore reques the Court to approve said notice.

<u>CONCLUSION</u>

Berndt, Steere, Peterson, and Harmon challenge the legitimacy of a policy which uniformly impacted members of the putative class. The legality of that policy can be determined by answering a common question: whether Cleary's policy failed to compensate employees for performing pre- and post-shift work.  This common question predominates over any individual issues that may exist in this case. Further, as the individual claims of the putative class members are small and these individuals may otherwise be unable to pursue their claims, a class action is the superior mechanism for this case. Because Named Plaintiffs have met these and the remaining Fed. R. Civ. P. 23 requirements, they request that the putative classes be certified and they are named case class representatives.

Dated: May 24, 2013

### HAWKS QUINDEL, S.C.

By:_____*/s/ William Parsons*_____
        William E. Parsons, State Bar No. 1048594
        Email: wparsons@hq-law.com
        David C. Zoeller, State Bar No. 1052017
        Email: dzoeller@hq-law.com
        222 West Washington Avenue, Suite 450
        Post Office Box 2155
        Madison, Wisconsin 53701-2155
        Telephone: 608-257-0040
        Facsimile: 608-256-2036

        Larry A. Johnson, State Bar No. 1056619
        Email: ljohnson@hq-law.com
        Summer H. Murshid, State Bar No. 1075404
        Email: smurshid@hq-law.com
        Post Office Box 442
        Milwaukee, Wisconsin 53202-0442
        Telephone: 414-271-8650
        Facsimile: 414-271-8442